THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PRENTICE PHILLIPS, Defendant-Appellant.

First District (1st Division)  No. 1—07—0985

Opinion filed June 15, 2009.—Rehearing denied July 9, 2009.

244

Patricia Unsinn and Caroline E. Bourland, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Ashley A. Romito, William L. Toffenetti, and Joseph A. Alexander, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

After a jury trial at which defendant Prentice Phillips appeared *pro se*, he was convicted of aggravated battery to a peace officer and sentenced to nine years in prison. On appeal, defendant claims: (1) that the State's evidence was insufficient to prove that defendant's contact with the peace officer was knowing or intentional, rather than inadvertent; (2) that defendant was denied his sixth amendment right to counsel because he did not make a clear and unequivocal waiver of his right to counsel, and because the trial court failed to admonish him fully before the alleged waiver; (3) that the trial court erred in failing to appoint standby counsel; and (4) that prosecutorial misconduct denied defendant a fair trial.

For the following reasons, we affirm.

## BACKGROUND

### Evidence at Trial

In essence, defendant was accused of punching a deputy sheriff in the face. An information charged defendant with committing an aggravated battery of a peace officer, in violation of section 12—4(b) of the Criminal Code of 1961 (720 ILCS 5/12—4 (b)(6) (West 2004)), by:

"committing a battery, other than by a discharge of a firearm, knowingly or intentionally caus[ing] bodily harm or ma[king] physical contact of an insulting or provoking nature, to wit: *** str[iking] police officer Hoffman in her face with his fist injuring her neck and shoulder, knowing Hoffman to be a peace officer, to wit: Cook County's Sheriff Department while engaged in the execution of her official duties."

The evidence at trial consisted entirely of the testimony of event witnesses. There were no experts, no forensic evidence, and no medical testimony. The State called five witnesses in its case in chief: (1) Deputy Sheriff Deborah Hoffman, the victim; (2) Deputy Sheriff Richard Young, the victim's partner; (3) Deputy Sheriff Gail McAu-

liffe; (4) Officer[1] Bonarek;[2] and (5) Officer Willy Lewis, the partner of Officer Bonarek. In the defense case, defendant testified on his own behalf. In its rebuttal case, the State called Deputy Sheriff Rocco Tudisco and recalled Deputy Sheriff Hoffman, the victim.

Deputy Sheriff Deborah Hoffman, the victim, testified as follows. She is approximately 5 feet 3 inches tall, and weighed under 150 pounds. On June 27, 2005, she was working in uniform as a deputy sheriff at bond court in the Skokie courthouse with her partner, Deputy Sheriff Richard Young. Neither she nor her partner was armed. The bond court was held in courtroom 105, and the lockup area for this courtroom contained a cell and an interview room. At approximately 2:30 p.m., defendant was in the lockup, with approximately three to five other people who had also been arrested. Deputy Sheriffs Bonarek and Lewis were in the interview room with a subject. When Deputy Sheriff Hoffman brought defendant out of the lockup, she directed him to keep his hands behind his back. While defendant was in the courtroom standing before the judge and waiting for the trial court to set his bond, Deputy Sheriff Hoffman stood behind him.

Hoffman testified that, during the bond hearing, defendant was "verbally belligerent" and that he "was reaching in his pockets" and "swinging his arms around." After defendant's bond was set, Hoffman and her partner walked defendant back to the lockup, with Hoffman walking backwards and facing defendant, and with her partner walking behind defendant. The door to the lockup area has a small glass window, and the door to the cell is a sliding glass door. When they reached the cell, Hoffman stood in front of the cell, facing the cell, and ordered defendant to enter the cell, several times. Defendant refused to enter the cell and took a step toward the courtroom. At this point, defendant was "half in, half out" of the cell. He was "swearing and saying he needed an I-Bond" and that he had been told that he was going to receive an "I-bond."

Hoffman testified that defendant was swinging his arms around and then he hit her. She testified that "[h]e just went right in the face, just bam." She testified that "[w]ith his left arm, [he] punched me in my left cheek, and came down and split my upper and lower

---

[1]Officer Bonarek testified that he was an officer with the "Special Operation Response Team" of the sheriff's office. Even though all the State's witnesses were deputy sheriffs, the witnesses used the term "officer" to refer both to Bonarek and his partner, Willy Lewis. Thus, we will do the same in this opinion.

[2]Officer Bonarek did not provide his first name when testifying at trial.

lip." His hand was "much larger than [her] cheek area." His fist landed first on her left upper cheek bone, and then "glanced down" to her lip, and she tasted blood. "[T]he force of it pushed [her] backwards" and "into the interview room that's across from the holding cell." Hoffman estimated that her body traveled the distance of a couple of steps. Later, Hoffman noticed a "stiffness" in her neck.

Hoffman further testified that she called on her radio for backup. The two officers who had been in the interview room stepped past her and into the cell. After backup arrived, Hoffman went into the washroom, and she observed in the mirror that her "face was red and puffy, and [her] upper and lower lip[s] were split and bleeding." She felt pain in her shoulder, lips, cheek and neck. Hoffman went to the hospital where she was X-rayed. She "had to wear a sling for a week and go to physical therapy," due to a "strain in [her] shoulder," and she "missed a little over a week" of work. The State introduced into evidence photographs of Hoffman's face, taken by Hoffman herself, approximately five or six hours after the incident.

On cross-examination by defendant, Hoffman admitted that, although she claimed she was "dazed" by the blow, she still had the presence of mind to radio for backup. Also, Hoffman testified that, before she left the lockup area, defendant was told to lie on the floor and that he complied.

Deputy Sheriff Richard Young, Hoffman's partner, testified as follows. On June 27, 2005, he was working with his partner at the bond court at the Skokie courthouse. During defendant's bond hearing, defendant stood before the bench and kept moving his hands from behind his back and placing them on the podium, even though he was told repeatedly to keep his hands behind his back. After the hearing, Young followed defendant back to the holding cell, while Hoffman walked in front of defendant. Young instructed defendant "to pick up the pace" because defendant "was shuffling his feet." At some point, Young made contact with defendant's body, and defendant "stopped, turned around [and] gave me an angry look." Defendant continued to walk toward the holding area but "slowly."

Young testified that at the door to the holding area, Hoffman took defendant into the holding area, while Young stopped and waited by the holding-area door, with the door partially open. Young testified that what "normally" happens is that the deputy sheriff opens the door to the cell, the arrestee walks into the cell, the deputy sheriff turns the key, and the cell door closes automatically. However, Young testified that the following happened in this case:

"Well, I seen [sic] [defendant] Phillips stop at the [cell] door and Deputy Hoffman instructed him to step in several times. I

instructed him to step in. He finally stepped in. He put his back to the wall and then he reached out and punched Deputy Hoffman in the face."

Young further testified that defendant punched Hoffman's "left side of the face, up around the nose and lower lip" with "a closed fist." Hoffman "recoiled backwards towards the interview room and her head struck the door frame and her back [struck]." When defendant punched Hoffman, he was standing "at the threshold" to the cell door. As Young entered the holding cell, defendant backed up, started removing his shirt and "put his hands up in closed fists." Deputy Sheriff Gail McAuliffe entered the holding area, with two other officers who subdued defendant and placed handcuffs on him.

On cross-examination, Young testified that during the bond hearing, defendant reached into his pocket to remove a piece of paper which he showed to the public defender and tried to show to the judge. Defendant told the judge that another police officer had told him that he would receive an "I-bond." After defendant punched Hoffman, and Young entered the holding area, Young was "knocked to the bench" by inmates running out of the holding cell, to avoid a violent situation.

The State's third witness, Deputy Sheriff Gail McAuliffe, testified that she observed Deputy Sheriff Hoffman escorting defendant back into the holding cell. Defendant was "shuffling"; Hoffman asked defendant to step inside the cell; defendant stepped inside, stopped, turned around and punched Hoffman with a closed fist; and Hoffman hit the wall on the other side of the holding area. After the punch, McAuliffe entered the cell with Young and two other officers. McAuliffe accompanied Hoffman to the ladies' room; and McAuliffe observed that Hoffman's cheek was red and Hoffman's lips were cut and bleeding.

On cross-examination, McAuliffe testified that, after the punch, she escorted the other inmates out of the cell for their safety. The inmates did not run out of the cell, and they did not knock down Deputy Sheriff Young.

Officer Bonarek testified that, on June 27, 2005, he was an officer with the "Special Operation Response Team" (SORT) of the sheriff's office, which handled "the high profile prisoners" and "the trouble makers." At approximately 2:30 p.m., he was with his partner and a prisoner in the interview room in the lockup area behind courtroom 105 in the Skokie courthouse. He heard an officer ordering an inmate back into the holdup area, and he saw a female officer "get struck in the face [by defendant] and she kind of went back after she got struck." Bonarek did not see whether defendant had an open hand or a closed fist. Bonarek and his partner, Officer Lewis, exited the

interview room, crossed the hallway and entered the cell, where they handcuffed defendant. Then, they waited for shackles to arrive; and they shackled defendant and removed him from the cell, to a holding cell downstairs. Bonarek explained that shackles are also called "leg irons" and they prevent an inmate from kicking. When Bonarek and his partner were attempting to handcuff defendant, defendant was not complying with their orders to "get down" and to place his hands behind his back. When Bonarek and his partner removed defendant from the cell, they carried him out, "because he was so uncooperative" and "wouldn't listen to commands."

Officer Willy Lewis testified that on June 27, 2005, he was working as a SORT officer with his partner, Officer Bonarek. At approximately 2:30 p.m., they were with a prisoner in an interview room, in a lockup area in the Skokie courthouse. Officer Bonarek informed him that another inmate had punched a female officer. Officers Lewis and Bonarek then locked their detainee in "the attorney's room" and entered the lockup cell, where they observed two deputy sheriffs "striking" defendant. As Officer Lewis entered the cell, he pushed another deputy out of the way. When defendant saw Officers Lewis and Bonarek, defendant started cooperating. Officer Lewis "put a basic arm bar on him," and they handcuffed him, but he refused to stand up. The officers placed shackles on defendant and "stood him up." Approximately five officers were working with Officer Lewis at this time. Four officers, including Officer Lewis, lifted defendant, with each one holding one limb. After lifting defendant up, they carried him to an elevator and to an interview room, downstairs in the courthouse.

After the State rested, defendant testified on his own behalf, as follows. On June 27, 2007, he appeared for a bond hearing, in relation to a misdemeanor charge. The trial court "gave [him] a fair bond and [he] was in good mood." After the bond hearing, two deputy sheriffs escorted him back to the lockup area. As they did so, "they were stepping on the back of [his] feet, poking [him] in the back, making noises." When the cell door slid open, defendant stepped into the cell, which already contained several other inmates. Deputy Sheriff Hoffman pushed him further into the cell, and defendant turned around to look at her. "Deputy Young stepped into the lockup immediately and grabbed me around my neck[,] attempting to choke me[,] pushing me farther back into the cell [and] into other inmates."

Defendant further testified that a "commotion" resulted. SORT officers, who had been "sitting directly across," then entered the cell and told defendant "to assume the position," which defendant did. Defendant let them place handcuffs and shackles on him. Defendant

was "kicked and hit" by deputy sheriffs, and Officer Bonarek "was standing on my back with his knee in my back and on my neck." Officer Lewis told Officer Bonarek "not to do that" and "[t]hey were all laughing" about it. While defendant was on the ground, he was asked to stand and he could not, so the officers picked defendant up by his arms and legs and carried him out of the lockup and into the elevator and headed downstairs. At that time, Officers Bonarek and Lewis departed, and other deputy sheriffs placed "another handcuff on [defendant], handcuffing [his] hands behind [his] back to [his] feet and left [him] that way until the county jail bus came." Subsequently, defendant received medical assistance.

Defendant testified that the original misdemeanor charge was "thrown out," that he did not punch anyone, and that he just wanted to "go home." Defendant "wrote a grievance to internal affairs on [Deputy Sheriff] Deborah Hoffman, and I signed papers with internal affairs about the abuse that I received at Skokie courthouse by these officers." Defendant also testified that the public defender who formerly represented him "put[ ] [him] in for psychiatric evaluations." The prosecutor objected, and the trial court asked the jury to reenter the jury room.

Out of the presence of the jury, the prosecutor objected to defendant's references to the internal affairs investigation, to his former representation by a public defender, and to his psychiatric evaluations. The trial court admonished defendant that he had an attorney-client privilege with respect to any discussions with his prior counsel, including any discussion regarding psychiatric evaluations, but that he would waive the privilege if he continued to testify about it. The trial court ruled it would allow the State to cross-examine defendant about the results of the psychiatric evaluations, but not about discussions with counsel. The trial court also ruled that defendant had "opened the door about the internal affairs investigations."

Resuming his testimony, defendant testified that Officer Lewis was the only officer who told the truth. Deputy Sheriffs Hoffman and Young lied, because defendant never touched Hoffman, and Young was wrestling defendant and trying to choke defendant. Officer Lewis saw Young's conduct when Lewis entered the cell. Young did not ask defendant to calm down; rather, Young attacked defendant and the other deputy sheriffs "joined in." Officer Bonarek "came from across the hallway to the cell that I was locked up in, and he twisted my arm and put his knee in my back, and knee on my neck, and cut off my circulation until I was almost unconscious, which is why they had to carry me out." Downstairs, the deputy sheriffs further abused

defendant and handcuffed his hands to his feet, behind his back, and left him that way "for hours."

Defendant testified that Officer Lewis told the truth when he stated that he did not see defendant punch Hoffman and when he stated that defendant did not resist arrest. The other officers made up "an excuse to justify what they did to [defendant], and that's it." On cross-examination, defendant testified that he received medical attention for "cuff burns to [his] wrist, and [his] ankle, and back pain."

After the defense rested, the State called as a rebuttal witness Deputy Sheriff Rocco Tudisco, who testified as follows. On June 27, 2005, Deputy Sheriff Tudisco assisted other officers in conveying defendant on an elevator and into the basement of the courthouse, where he was placed in an interview room. At the time, defendant was handcuffed and his feet were shackled. Defendant sat on a table in the interview room, because there were no chairs. Tudisco observed defendant prior to his transportation to the jail, and defendant was not "hog-tied" and he bore no visible marks. On June 28, 2005, Tudsico asked defendant whether he wanted medical attention, and defendant replied no. Defendant told Tudsico that "[h]e was going to sue us for a $1 million." Subsequently, Tudisco was asked to report to the internal affairs department of the sheriff's department, where he told the investigating officers what he observed. The investigating officers informed Tudisco that he would be exonerated, and no disciplinary action was taken against him.

On cross-examination, Tudisco testified that he asked defendant whether he wanted medical attention both on "the day of the incident and the morning after the incident" and that defendant replied no.

As part of its rebuttal case, the State also recalled Deputy Sheriff Hoffman, the victim, who testified that she had observed defendant in the Skokie courthouse "a couple of times" since the incident and that defendant stated "he was going to have [her] job, and he was suing [her] for millions of dollars."

After hearing the foregoing evidence, the jury convicted defendant of aggravated battery.

## Pretrial Proceedings

Defendant ignored his own counsel and tried to represent himself, almost from the moment that counsel was appointed for him. At defendant's arraignment on August 9, 2005, after being informed that an assistant public defender had been appointed to represent him, defendant tried to interrupt proceedings and speak directly to the trial court. The trial court then stated: "Hold on Mr. Phillips. Let's handle one issue at a time." A few seconds later, defendant tried to interrupt again, and the trial court stated, "[o]ne second, one second."

When the trial court gave defendant an opportunity to be heard, defendant began acting as his own counsel. First, he asked "if the State would accept a plea of *nolo contendre* [*sic*]," which the prosecutor refused. Second, he demanded both an immediate trial and a copy of the police report. When the trial court explained that "[d]iscovery is being tendered to your attorney," defendant responded: "I just want it on the record that I would like a copy of the police report. It says in the 6th Amendment that I have a right to—." The trial court again explained that a copy of the police report would be provided to his attorney.

The trial court, defendant and Ms. Johnson, his defense counsel, then began a discussion of whether defendant was seeking to represent himself:

"THE COURT: Okay. Mr. Phillips is demanding trial.

MS. JOHNSON: Judge, if Mr. Phillips wishes to represent himself, he can do so[;] however, I just received the case today and I am in no position to demand trial.

THE COURT: What date would you like? And you have not seen any discovery at any point?

MS. JOHNSON: I have received some discovery, yes. I acknowledged receipt of some, but again, today is the arraignment date, and I just received it as we took the bench here and did the arraignment.

So, again, I am in no position to represent Mr. Phillips in a demand for trial.

THE COURT: Okay.

MS. JOHNSON: If he does wish to represent himself and if he persists in his demand, I would be asking for leave to withdraw at this time. I certainly could not give adequate counsel.

THE COURT: Mr. Phillips, do you wish to represent yourself?

DEFENDANT: No, I don't, but I am demanding trial."

In the above colloquy, defendant claimed that he wanted representation, but he also refused to accept his counsel's decision that she needed preparation time.

Even after the trial court explained to defendant his counsel's need for more time, defendant continued to try to represent himself, by demanding an immediate trial, by interjecting that he did not accept the agreed date for the State's discovery, and by trying to make his own motion when his demands were denied:

"THE COURT: Mr. Phillips, I will give your counsel an opportunity to prepare adequately for your defense, and in that way, she must obtain—must make sure she obtains all of the information required in order to mount your defense.

She is not prepared to go to trial at this time.

DEFENDANT: She is prepared to go to trial, Judge.

THE COURT: Mr. Phillips, please.

What date for exchange of discovery?

MS. JOHNSON: Judge, how is August 31st for that purpose?

THE COURT: That is fine.

8-31-05, and then you can evaluate at that time whether or not you will be able to demand trial.

MS. JOHNSON: Yes.

MS. GREMSKIE [Assistant State's Attorney]: By agreement until then.

DEFENDANT: No, it is not. Motion defendant."

Thus, despite his claimed desire for representation, defendant continued to try to represent himself.

At the next court appearance on August 31, 2005, defendant was informed that his case was being transferred from the courthouse in Skokie, Illinois, to one in Chicago, Illinois, since the complaining witness was a deputy sheriff in the Skokie courthouse. Even though Ms. Johnson, his appointed counsel, was present, defendant ignored his counsel and, in effect, represented himself: by agreeing to the transfer; by demanding a speedy trial; by asking the trial court to clear two additional charges of battery to a police officer that appeared on his "transcript"; and by starting to argue the merits of his case.

On September 2, 2005, defendant appeared at the Chicago courthouse, where the trial court informed him that a different public defender would be appointed for him.

On September 29, 2005, defendant appeared at the Chicago courthouse, with his second public defender, Ms. Solomon. As he had done with his first public defender, defendant complained about his second public defender, almost from the moment she was appointed. After the prosecutor agreed to a three-week extension to allow the new defense counsel time to obtain records and discovery, defendant interrupted, stating:

"No, not by agreement, your Honor. Your Honor, not by agreement. Motion Defendant. I understand that we're waiting for the discovery and stuff like that. I'm ready to demand trial and not by agreement. I have 43 days."

The trial court then asked the prosecutor to state the nature of the charge for the record, which was the aggravated battery of a Cook County sheriff employed in the Skokie courthouse.

Ms. Solomon, defendant's new counsel, informed the trial court that she had already explained to defendant that she was not ready for trial, and that if he wanted to demand a trial, then he would have to proceed *pro se*. However, defendant desired both representation by

the public defender and an immediate trial. The trial court then attempted to explain to defendant that this was not an option:

"THE COURT: *** My concern is, if you're answering ready for trial, your attorney is not—then she's not going to represent you; therefore, you'll have to represent yourself, unless you're going to hire another attorney to come in.

DEFENDANT: No, I can't.

THE COURT: Then, you'll have to represent yourself, if you want to demand trial.

DEFENDANT: I'm asking if my attorney—Can you demand trial?

MS. SOLOMON: No, I cannot. I'm not ready.

THE COURT: She's not ready. She doesn't have the material. She has to look at what they have.

DEFENDANT: I'm not agreeing to a—I'm not agreeable by agreement."

The trial court then admonished defendant, concerning the nature of the charge and the possible penalties. The trial judge stated that he wanted to ensure that defendant understood what he would be "faced with" if defendant decided to represent himself. The trial court further explained that if defendant decided to represent himself, discovery would be tendered to defendant and the trial court would permit the public defender to withdraw.

The trial court then asked defendant if he wanted to represent himself. Instead of answering yes or no, defendant replied: "I'm asking for a motion Defendant, just suspend it *** so that I can have my credit for my 43 days on my speedy-trial term." The trial court then explained that the past 43 days were not counted for purposes of the speedy trial clock, because the extension of time was by agreement.

After a brief discussion off the record, the trial court again explained to defendant that he could not have it both ways:

"If you're demanding trial, you will have to represent yourself or hire another lawyer. Otherwise, you're going to have to go along with the lawyer that has been appointed to represent you, which is the Public Defender. It's as simple as that. You have no choice. You can't have it all—both ways."

After more discussion on the record, defendant responded "I guess" when asked if he wanted representation. The case was then continued for three weeks. On October 19, 2005, defendant appeared before the same trial judge, who asked him if he wanted to represent himself, and he answered no.

Apparently after defense counsel had more time to meet and talk with defendant, defense counsel requested a psychiatric examination of defendant which the trial court ordered on November 21, 2005. On January 6, 2006, the trial court informed defendant that the report

concluded that he was legally sane and fit to stand trial. On that date, defendant again demanded trial and discovery. Defendant stated that this was nothing more than a "Tylenol and chapstick" case, and that he was "willing to bet there's nothing more than that." The trial court again explained to him that he was not entitled to have his attorney provide him with a copy of the discovery materials and that if he wanted to demand trial, he would have to represent himself. Defendant stated that he did not want to represent himself.

On February 6, 2006, defense counsel stated that a recent visit to defendant in jail convinced her that defendant needed further psychiatric evaluation, and she advised the court that she was retaining a private psychiatrist to evaluate defendant. When defense counsel asked for an extension until April 10, 2006, to allow for the private evaluation, defendant interjected:

"Judge, that's a bad idea. This young woman, she is not in my favor. She has called me stupid, ignorant, a black n-----, she has called me everything. April 10th? Oh, my G-d.

Can I change my counselor because she's no good?"

The trial court informed him that he had the option to hire a private attorney. Defendant responded: "I can't believe you're letting her do this to me. I will walk out of here."

On June 9, 2006, defense counsel requested an additional extension because the report from the private psychiatric evaluation had not been completed. Defendant told the trial court that there was "nothing wrong" with him, that he demanded trial, and that he wanted to "excuse her as [his] Public Defender here right now." The trial court instructed defendant to talk to his counsel off the record. After defendant and his counsel talked off the record, defendant indicated to the trial court that he still wished to represent himself. The trial court then admonished defendant concerning the possible penalties he could face:

"THE COURT: I want you to understand that this is a Class 3 felony that you are charged with and there is a penalty of two to five years in the Illinois Department of Corrections and up to twenty-five hundred dollar fine. Upon release from being incarcerated there will be a one year mandatory supervise release period. I don't know based upon your background if you are eligible for extended term sentence and if you are then it would no longer be two to five. It will be two to ten years in the Illinois Department of Corrections and up to a twenty-five thousand dollar fine with a one year mandatory supervised release.

I want you to understand that, do you understand that?

DEFENDANT: Yes, I do.

THE COURT: And knowing that do you still wish to represent yourself?

DEFENDANT: Yes, I do."

The case was then continued to July 11, 2006. Only six months had elapsed between his counsel's appointment and her discharge; and almost all of that delay was due to waiting for the completion of psychiatric evaluations.

At the next court appearance, on July 11, 2006, defendant indicated that he was still representing himself and demanded discovery. The trial court ordered the prosecutor to redact the discovery, to provide defendant with a copy by the next court day, and to have defendant sign to confirm his receipt of the information. Defendant then requested specific clothing for trial, and the trial court agreed to sign the order. Defendant stated that he intended to subpoena as witnesses: (1) Mary J. Maxwell, a judge in the Skokie courthouse; and (2) the doctor who examined the injured officer. Defendant stated that he would "be also asking for co-counsel." However, the trial court continued the case.

On July 18, 2006, the trial court asked if defendant was seeking to have standby counsel appointed, and defendant replied that he was. When the trial court asked who he was seeking as co-counsel, defendant replied that he had no idea. The trial court then admonished defendant regarding: (1) the minium and maximum penalties for this offense; and (2) defendant's right to counsel and to appointed counsel. The trial court asked again if defendant was still seeking to represent himself; and defendant stated: "I'm asking to represent myself, that's correct."

Next, the trial court asked Ms. Solomon, the assistant public defender who had previously represented defendant and who was present in the courtroom, if she would act as standby counsel. Ms. Solomon explained that it was the policy of her office not to act as standby counsel, but that she would act as standby counsel if the trial court ordered her to do so.

Then, the trial court denied defendant's request for standby counsel and informed defendant that he had to choose between representing himself or allowing the assistant public defender to represent him. Defendant responded with a tirade against his appointed counsel, stating: she was not "acting independent of the [S]tate," he had written "her up to the ARDC," she asked for a psychiatric evaluation when there was "nothing wrong" with him, and she represents "legal fiction making me out to be a nut case." At the end, he concluded: "I'm going to have to represent myself because I'm tired of sitting in jail."

The trial court responded:

"I advise you under the law you have a right to have an attorney if you are indigent. You don't have a right to choose which

particular attorney is going to represent you if you are indigent. You indicate that you wish to represent yourself and you indicate that you are ready for trial."

After the case proceeded to trial, the jury found defendant guilty of aggravated battery to a peace officer. On August 21, 2006, counsel was appointed to represent defendant for purposes of a posttrial motion and sentencing. Subsequently, defense counsel filed a motion for a new trial, which incorporated by reference a *pro se* petition for a new trial authored by defendant. The trial court denied the motion, and sentenced defendant to nine years imprisonment. This appeal followed.

## ANALYSIS

On appeal, defendant claims: (1) that the State's evidence was insufficient to prove defendant's contact with the peace officer was intentional or knowing, rather than inadvertent; (2) that defendant was denied his sixth amendment right to counsel because he did not make a clear and unequivocal waiver of his right to counsel and because the trial court failed to admonish him fully prior to the alleged waiver; (3) that the trial court erred in failing to appoint standby counsel; and (4) that prosecutorial misconduct denied defendant a fair trial.

### Sufficiency of the Evidence

■ Defendant claims that the State failed to prove him guilty beyond a reasonable doubt. The due process clause of the fourteenth amendment to the United States Constitution "requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004), quoting *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970).

When we review a claim that the evidence was insufficient to sustain a conviction, "the question is 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Cunningham*, 212 Ill. 2d at 278-79, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Hunter*, 331 Ill. App. 3d 1017, 1025 (2002). "The *Jackson* standard applies in all criminal cases, regardless of the nature of the evidence." *Cunningham*, 212 Ill. 2d at 279. In applying this standard, "a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *Cunningham*, 212 Ill. 2d at 280.

Defendant was charged with aggravated battery to a peace officer. 720 ILCS 5/12—4 (b)(6) (West 2004). The essential elements of that

offense are found in the descriptions of both battery and aggravated battery. A person commits a battery if he or she, "intentionally or knowingly without legal justification," causes bodily harm or makes physical contact of an insulting or provoking nature. 720 ILCS 5/12—3 (West 2004). If a person commits a battery against an individual whom he or she knows to be "a peace officer" while that individual is "engaged in the execution of any official duties," it constitutes an aggravated battery. 720 ILCS 5/12—4 (b)(6) (West 2004).

Defendant claims on appeal that the prosecution failed to prove the required mental state. Specifically, defendant claims that the State failed to prove that his contact with the peace officer was intentional or knowing, rather than inadvertent. In his appellate brief, defendant concedes that the evidence "supports a conclusion that [defendant] Phillips made contact with [Deputy Sheriff] Hoffman while he was wild and flailing about." Thus, defendant does not dispute on appeal: (1) that Deputy Sheriff Hoffman was a peace officer; (2) that she was engaged in the execution of her official duties; (3) that defendant knew that she was a peace officer; and (4) that he made physical contact with her.

Intent is an essential element of the offense of battery. *People v. Robinson*, 379 Ill. App. 3d 679, 684-85 (2008); *People v. Begay*, 377 Ill. App. 3d 417, 421 (2007) ("State must prove defendant's intent" in an aggravated battery case). Defendant also claims that battery is a specific intent crime. The case law goes both ways: some cases say it is a specific intent crime; and some say it is a general intent crime. *Robinson*, 379 Ill. App. 3d at 683 (providing a list of the appellate court cases that have held that battery and aggravated battery are specific intent crimes; and those that have held that they are general intent crimes). "Regardless of whether one calls battery a specific intent crime or a general intent crime, however, the criminality of a defendant's conduct depends on whether he acted knowingly or intentionally, or whether his conduct was accidental." *Robinson*, 379 Ill. App. 3d at 684-85. Thus, the State must prove, as an essential element, that defendant's conduct was knowing or intentional, and not accidental. *Robinson*, 379 Ill. App. 3d at 684-85.

Defendant claims that his conduct was accidental, and he asks this court either to reverse his conviction or to reduce the offense to "reckless conduct" and remand for sentencing. 720 ILCS 5/12—5 (West 2006) (defining the offense of "reckless conduct"). Statutory law defines the terms at issue here: knowingly, intentionally and recklessly. A person "acts knowingly" if "he is consciously aware that his conduct is of such nature" that it is "practically certain" to cause the result proscribed by the offense. 720 ILCS 5/4—5 (West 2004); *People*

*v. Moore*, 358 Ill. App. 3d 683, 688 (2005). A person "acts intentionally" if the "conscious objective or purpose is to accomplish the result." 720 ILCS 5/4—4 (West 2004). In contrast, "a person acts recklessly" if "he consciously disregards a substantial and unjustifiable risk." 720 ILCS 5/4—6 (West 2004).

Where, as here, defendant denies intent, the State may prove defendant's intent through circumstantial evidence. *People v. Begay*, 377 Ill. App. 3d 417, 421 (2007); *People v. Barnes*, 364 Ill. App. 3d 888, 896 (2006). For example, intent may be inferred (1) from the defendant's conduct surrounding the act and (2) from the act itself. *Begay*, 377 Ill. App. 3d at 421-22 (intent could be inferred from defendant's conduct immediately prior to the battery); *Barnes*, 364 Ill. App. 3d at 896 (intent could be inferred from the nature of the act itself); *People v. Bodeman*, 105 Ill. App. 3d 39, 45 (1982).

First, defendant's conduct prior to the act showed that he was angry. He was angry that he did not receive an "I-bond"; he refused to enter the cell; and he started swinging his arms around. On appeal, defendant argues that these facts indicate that his contact with Deputy Sheriff Hoffman was inadvertent. However, we fail to see how expressions of anger are inconsistent with an intentional or knowing act. To the contrary, a jury could reasonably infer intent from expressions of anger, made immediately prior to the battery. *Begay*, 377 Ill. App. 3d at 421-22 (intent could be inferred from defendant's "egging" of the victim's car immediately prior to the battery).

Second, the act itself provides evidence of intent or knowledge. At trial, Deputy Sheriffs Young and McAuliffe testified that defendant punched Deputy Sheriff Hoffman with a closed fist. A jury could reasonably infer from a closed fist that the resulting battery was intentional rather than inadvertent. *Barnes*, 364 Ill. App. 3d at 896 (a fact finder could reasonably infer an intent to kill from the fact that defendant fired several shots at the victims).

On appeal, defendant claims that the closed fist testimony of Deputy Sheriffs Young and McAuliffe was inconsistent with Deputy Sheriff Hoffman's testimony that defendant was "just swinging his arms around and then he hit [her]," in the face, "just bam." We fail to see how the expression "bam" is inconsistent with a closed-fist punch.

For the foregoing reasons, we find that a rational trier of fact could find the essential element of intent, beyond a reasonable doubt.

## Waiver of Right to Counsel

Defendant makes two claims on appeal regarding waiver of counsel: (1) that his waiver was not clear and unequivocal; and (2) that the trial court failed to provide all the admonishments required

by Illinois Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)), before a trial court may find that a defendant waived counsel.

### a. Clear and Unequivocal Waiver

■ The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees an accused in a criminal proceeding the right to the assistance of counsel. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). Any waiver of that right must be voluntary, knowing and intelligent. *Jiles*, 364 Ill. App. 3d at 328, citing *People v. Haynes*, 174 Ill. 2d 204, 235 (1996).

A defendant's waiver of the right to counsel must also be clear and unequivocal. *People v. Mayo*, 198 Ill. 2d 530, 538 (2002), *People v. Burton*, 184 Ill. 2d 1, 21 (1998). The purpose of requiring a clear and unequivocal waiver is to "(1) prevent the defendant from appealing [either] the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se.*" *Mayo*, 198 Ill. 2d at 538. To determine whether defendant's waiver was clear and unequivocal, a court will look to " 'the overall context of the proceedings,' " including " 'the defendant's conduct following the defendant's request to represent himself.' " *Mayo*, 198 Ill. 2d at 538-39, quoting *Burton*, 184 Ill. 2d at 22, 23-24.

On appeal, defendant claims that the question of whether his waiver was clear and unequivocal is a legal question that we must review *de novo*. In support, defendant cites one case where an appellate court reviewed *de novo* the question of whether a defense counsel's waiver of a jury trial, outside the presence of the defendant, constituted a "knowing" waiver by the defendant. *People v. Victors*, 353 Ill. App. 3d 801, 805, 807-08 (2004). However, as noted above, to determine whether a defendant's waiver of his right to counsel was "clear and unequivocal," a trial court must consider " 'the overall context of the proceedings.' " *Mayo*, 198 Ill. 2d at 538, quoting *Burton*, 184 Ill. 2d at 22. It is well established that we review this determination only for an abuse of discretion. *Mayo*, 198 Ill. 2d at 539 (finding that the trial court had not "abused its discretion"); *Burton*, 184 Ill. 2d at 25 (finding that "the circuit court did not abuse its discretion"). See also *People v. Dixon*, 366 Ill. App. 3d 848, 852 (2006) (" 'We review the trial court's finding that defendant waived his right to counsel under an abuse of discretion standard' "), quoting *People v. Hughes*, 315 Ill. App. 3d 86, 91 (2000).

We find that the trial court did not abuse its discretion when it found that defendant's waiver was clearly and unequivocally made.

First, defendant made a clear and unequivocal waiver, several times. On June 9, 2006, defendant stated that he wanted to "excuse" his counsel "right now." After admonishing defendant about the available penalties, the trial court asked defendant "knowing that, do you still wish to represent yourself[?]" Defendant replied unequivocally: "Yes, I do." On July 18, 2006, prior to the start of trial, the trial court admonished defendant about the available penalties and the right to counsel, and asked him again if he was still seeking to represent himself, and he replied: "I'm asking to represent myself, that's correct." Thus, defendant stated his waiver of counsel, clearly and several times.

Second, defendant's subsequent conduct was consistent with waiver. "In determining whether a defendant seeks to relinquish counsel, courts may look at the defendant's conduct following the defendant's request to represent himself." *Burton*, 184 Ill. 2d at 23-24. At the following court appearance, on July 11, 2006, defendant indicated that he was still representing himself; and he demanded discovery and trial clothes, and stated his intent to subpoena certain witnesses. On July 18, 2006, he asked for standby counsel; and when that request was denied, he proceeded to represent himself throughout the trial. During cross-examination at trial, defendant was asked the following questions and gave the following answers:

"ASSISTANT STATE'S ATTORNEY: You chose to represent yourself, isn't that true?

DEFENDANT: After nine months later, yes, I did.

ASSISTANT STATE'S ATTORNEY: You fired your public defender?

DEFENDANT: Yes, I did."

Thus, defendant's conduct after the waiver was consistent with waiver.

On appeal, defendant highlights excerpts from the record where defendant said that he "might as well" represent himself and other similar statements. The trial court did not formally inquire into defendant's dissatisfaction with his counsel, because defendant stated his reasons, repeatedly and on the record and at almost every court appearance. For example, at his arraignment on August 9, 2005, defendant expressed dissatisfaction with counsel because she did not demand an immediate trial—even though both the trial court and his counsel explained to defendant the need for at least some preparation time. Even though new counsel was appointed for him, defendant's complaints remained the same. For example, on September 29, 2005, less than a month after a different defender was appointed, defendant expressed dissatisfaction with his new counsel, for the same exact reason. There is no need for a trial court to conduct a formal inquiry when a defendant repeatedly voices his reasons.

Considering both the overall context of the proceedings and defendant's subsequent conduct, and keeping in mind that the trial court was in a position to observe defendant's demeanor and tone of voice, we cannot say that the trial court abused its discretion by finding that defendant had waived his right to counsel.

### b. Admonishments

■ Defendant also claims that his waiver is invalid, because the trial court failed to provide certain admonishments. Under Illinois law, a trial court is required to provide three admonishments to a defendant in open court before it can find that the defendant waived his right to counsel. 134 Ill. 2d R. 401(a). Illinois Supreme Court Rule 401(a) states, in full:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> > (1) the nature of the charge;
> >
> > (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
> >
> > (3) that he has a right to counsel, and, if he is indigent, to have counsel appointed for him by the court." 134 Ill. 2d R. 401(a).

While compliance with Supreme Court Rule 401(a) is required for an effective waiver of counsel, substantial compliance is sufficient "if the record indicates that the waiver was otherwise made knowingly, intelligently, and voluntarily, and the admonishments the defendant received did not prejudice his rights." *People v. Jiles*, 364 Ill. App. 3d 320, 329 (2006), citing *People v. Coleman*, 129 Ill. 2d 321, 333 (1989), and *People v. Johnson*, 119 Ill. 2d 119, 132 (1987) ("substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel").

We find that the trial court substantially complied with the required admonishments.

On June 9, 2006, when defendant decided to represent himself, the trial court admonished defendant concerning "the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences," as required by Rule 401(a)(2). 134 Ill. 2d R. 401(a)(2). However, the trial court did not discuss, on that day, the other two admonishments required by Rule 401(a), which

were: (1) "the nature of the charge," namely, aggravated battery; or (2) defendant's right to have counsel and to have appointed counsel if indigent. 134 Ill. 2d R. 401(a).

Nonetheless, we find substantial compliance with Rule 401(a). First, defendant was fully admonished nine months earlier, on September 29, 2005, and approximately a month later, on July 18, 2006, prior to the start of trial. On appeal, defendant observes that on September 29, 2005, the trial court told him that the charge was a Class 3 felony, whereas on July 18, 2005, the trial court told him that the charge was a Class 2 felony, which was incorrect.[3] However, defendant does not claim that he suffered any prejudice from this error. *Johnson*, 119 Ill. 2d at 134 (substantial compliance was found, where defendant "suffered no prejudice as a result" of the trial court's error). On July 18, 2005, the trial court did inform him that he could receive up to 10 years' imprisonment; and defendant did, in fact, receive 9 years for this offense. Defendant does not claim that he would have acted any differently if he had been informed of the correct class of felony. *Johnson*, 119 Ill. 2d at 134 (defendant "does not assert his decision to waive counsel would have been different had he been specifically admonished regarding" this fact).

Second, there is nothing in the record to indicate that defendant failed to understand the charges against him. *Johnson*, 119 Ill. 2d at 133 (substantial compliance was found, where "defendant [did] not claim he was unaware of the potential penalties," although not fully admonished about them). The charges were fairly simple: he was accused of hitting a deputy sheriff in the face. There was nothing particularly complicated or sophisticated about these charges. *People v. Smith*, 377 Ill. App. 3d 458, 461 (2007) (observing that a charge of aggravated battery to a peace officer was "factually simple").

---

[3]At the time that defendant committed the offense, it was a Class 3 felony. Subsection (e) (720 ILCS 5/12—4(e) (West 2004)) provided that aggravated battery was a Class 3 felony. However, it became a Class 2 felony, if it was both (1) a violation of subsection (a); and (2) the defendant knew the victim was a peace officer engaged in his or her duties. 720 ILCS 5/12—4(e) (West 2004). In the case at bar, defendant did not violate subsection (a), which required great bodily harm, permanent disability, or permanent disfigurement; thus his offense remained a Class 2 felony. 720 ILCS 5/12—4(e) (West 2004). However, subsection (e) was subsequently amended to make aggravated battery a Class 2 felony if the defendant knew the victim was a police officer, even though the injury did not rise to the level of great bodily harm, permanent disability, or permanent disfigurement. 720 ILCS 5/12—4(e) (West 2004). Thus, if a defendant committed the same offense today, it would be a Class 2 felony.

Third, since defendant had, until that moment, been represented by appointed counsel, he knew that he had a right both to counsel in general and to appointed counsel due to being indigent. *Johnson*, 119 Ill. 2d at 132 (substantial compliance was found, where the record indicated that defendant knew the minimum penalty, although not admonished about it); *People v. Jackson*, 59 Ill. App. 3d 1004, 1008 (1978) ("We conclude defendant understood this right to counsel because he had in fact been represented by the public defender *** without charge, until he discharged him"). In addition, on August 9, 2005, at the arraignment, the trial court informed defendant that an assistant public defender had been appointed as his counsel in this matter; and on September 2, 2005, the trial court informed him that new counsel would be appointed for him, since his case had been transferred from Skokie to Chicago.

Fourth, defendant had extensive experience with the court system. *Johnson*, 119 Ill. 2d at 133 (substantial compliance was found, in part, because "defendant is no stranger to criminal proceedings"); *Jackson*, 59 Ill. App. 3d at 1008-09 (substantial compliance was found, in part, because of "defendant's lengthy record and his familiarity with criminal law and procedure"). According to his presentence report, defendant had stood accused of battery a number of times before.

The case at bar is distinguishable from *Jiles*, where the appellate court found there was not "even substantial compliance" with the required admonishments. *Jiles*, 364 Ill. App. 3d at 329. Substantial compliance was lacking where the trial court provided only a partial admonishment and this partial admonishment occurred a full three months before "defendant *first* inquired about waiving his right to counsel." (Emphasis added.) *Jiles*, 364 Ill. App. 3d at 329-30. The admonishment was partial because the trial court failed to inform defendant "regarding the most serious crime with which he was charged *** or the possible penalties for that crime." *Jiles*, 364 Ill. App. 3d at 330.

*Jiles* is readily distinguishable, because, first, defendant in the case at bar was fully admonished; second, defendant was admonished on September 29, 2005, when the possibility of waiver was first discussed at length; and, third, defendant was informed regarding the one and only crime with which he was charged. Since the facts of *Jiles* are readily distinguishable from the facts at bar, the holding in *Jiles* does not compel a different result here.

In sum, we find that defendant was not denied his sixth amendment right to counsel, where (1) the trial court did not abuse its discretion when it found that defendant's waiver of counsel was clear and unequivocal; and (2) the trial court substantially complied with the

admonishments required by Illinois Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)).

## Standby Counsel

■ Defendant claims that the trial court erred by not appointing standby counsel to assist him.

The decision whether to appoint standby counsel is left to the trial court's broad discretion, and we will not reverse on appeal, unless the trial court abused its discretion. *Smith*, 377 Ill. App. 3d at 461, citing *People v. Redmond*, 265 Ill. App. 3d 292, 304 (1994).

A defendant who decides to proceed *pro se* must be prepared to do so. *People v. Smith*, 377 Ill. App. 3d 458, 461 (2007), citing *People v. Williams*, 277 Ill. App. 3d 1053, 1058 (1996). However, a trial court has the discretion to appoint standby counsel to assist him. *Smith*, 377 Ill. App. 3d at 461, citing *People v. Redmond*, 265 Ill. App. 3d 292, 304 (1994). To decide whether to appoint standby counsel, a trial court will consider: (1) the nature and gravity of the charge; (2) the expected factual and legal complexity of the proceedings; and (3) the abilities and experience of the defendant. *Smith*, 377 Ill. App. 3d at 461, citing *People v. Gibson*, 136 Ill. 2d 362, 380 (1990). Although the trial court in the case at bar did not recite these factors on the record, a trial court is presumed to know the law and apply it properly. *People v. Baugh*, 358 Ill. App. 3d 718, 730 (2005). In addition, we may affirm a trial court on any basis supported by the record. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005).

Balancing these three factors, we find that the trial court did not abuse its discretion in denying standby counsel. First, the charge was serious, as it resulted in a sentence of nine years of incarceration. However, second, neither the facts nor the law was complex. Defendant was accused of hitting a police officer in the face. This is a fairly simple issue for both a defendant and a jury to grasp. *Smith*, 377 Ill. App. 3d at 461 (aggravated battery of a peace officer was "factually simple"). No expert testimony or scientific evidence was involved at trial. *Smith*, 377 Ill. App. 3d at 461 (finding that standby counsel was not required, appellate court observed that the trial did not involve expert or scientific evidence).

Third, we must consider the abilities and experience of the defendant. *Smith*, 377 Ill. App. 3d at 461. In the case at bar, defendant was 41 years old, and no stranger to criminal proceedings. *Johnson*, 119 Ill. 2d at 133 ("defendant is no stranger to criminal proceedings"); *Jackson*, 59 Ill. App. 3d at 1009 ("[d]efendant was no stranger to criminal proceedings"). The list of convictions in his presentence report occupied approximately five pages and included several convic-

tions for battery. Thus, defendant was an adult who had experience and familiarity with the court system.

On appeal, defendant claims that his prior convictions were the result of either guilty pleas or bench trials and thus he had no prior experience with a jury trial. As factual support, he cites only the same assertion previously made in his counsel's motion for a new trial. Even if we were to accept this assertion as true, prior bench trials provided defendant with some experience and familiarity with trial proceedings.

On appeal, defendant also claims that he needed standby counsel because he had little time to prepare for trial. We are reminded of the old adage about the son who murders his parents and then asks mercy from the court because he is an orphan. The reason why defendant did not have more time to prepare was because he repeatedly demanded an immediate trial.

Defendant was on his second public defender when he discharged his counsel. For both of his defenders, defendant complained from the very first moment of their appointment, when they had not yet had even the opportunity to be ineffective. His immediate complaints show that his dissatisfaction had nothing to do with counsel's performance, because his complaints started before either counsel had the time or opportunity to perform. Only six months elapsed between his second counsel's appointment and her discharge, with defendant demanding an immediate trial from the very start. To the extent that defendant now complains about the lack of time to prepare, that lack was his own doing.

The case at bar is almost indistinguishable from *Smith*, where we held, in another case of aggravated battery to a peace officer, that a trial court did not abuse its discretion by denying defendant's request for standby counsel. *Smith*, 377 Ill. App. 3d at 461. Although the defendant in *Smith* was sentenced to 15 years of imprisonment, we observed both that the charges of aggravated battery to a peace officer were "factually simple" and that the case did not involve either expert testimony or scientific evidence. *Smith*, 377 Ill. App. 3d at 461. In addition, the defendant in *Smith* claimed that he had experience representing himself. *Smith*, 377 Ill. App. 3d at 461. While defendant in the case at bar did not claim to have previously represented himself, he did have extensive familiarity with the criminal system. Thus, like *Smith*, the charges were the same, the facts and law were not complex, the defendant had prior experience with the criminal system, and we found no abuse of discretion in denying a request for standby counsel. *Smith*, 377 Ill. App. 3d at 461. The result here must be the same.

In addition, this case is readily distinguishable from *People v. Pratt*, 391 Ill. App. 3d 45 (2009), where Justice Hall in a dissent found

that standby counsel should have been appointed. *Pratt*, 391 Ill. App. 3d at 59. In *Pratt*, defendant had complained to the trial court about the effect that his psychotropic medication had on his ability to represent himself; defendant was facing a charge of first-degree murder; and defendant had filed a written motion seeking to withdraw his waiver of counsel. *Pratt*, 391 Ill. App. 3d at 48-49. None of those facts apply here.

After balancing the relevant factors, we find that the trial court did not abuse its discretion when it denied defendant's request for standby counsel.

### Prosecutorial Misconduct

■ Defendant claims that the prosecutor committed misconduct: (1) by certain statements during opening and closing remarks to the jury; (2) by using "trick" questions during cross-examination of defendant; and (3) by asking "misleading" questions during the State's rebuttal case.

### a. Plain Error Review

Defendant concedes in his appellate brief that he waived the issue of prosecutorial conduct because he did not object to the alleged misconduct either at trial or in the posttrial motion, filed by counsel[4] on March 27, 2007. The alleged misconduct was also not raised in defendant's *pro se* petition entitled "Mot. For New Trial, J. of Acquittal, NOV, Petition for Post-Conviction Relief."[5]

The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. *Piatkowski*, 225 Ill. 2d at 562-63; 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the

---

[4]On August 21, 2006, counsel was appointed to represent defendant for purposes of a posttrial motion and sentencing.

[5]The *pro se* petition in the appellate record does not bear either a date or a filing stamp. However, the trial court stated in open court on August 21, 2006, that leave to file the motion was granted. In addition, the new trial motion filed by counsel stated that "[t]he allegations contained in Mr. Phillips' *Pro Se* Motion are hereby incorporated into and made part of this motion."

evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. With plain error analysis, "it is the defendant who bears the burden of persuasion with respect to prejudice." *Woods*, 214 Ill. 2d at 471. However, in order to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

### b. Opening Statement

Defendant claims that certain remarks in the State's opening remarks constituted prosecutorial misconduct.

"An opening statement may include a discussion of the evidence and matters that may reasonably be inferred from the evidence." *People v. Burton*, 338 Ill. App. 3d 406, 415 (2003); *People v. Arroyo*, 339 Ill. App. 3d 137, 149 (2003); *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). In an opening statement, a prosecutor may not make an argument whose only purpose is to inflame the passions of the jurors or to arouse prejudice against the defendant, without throwing any light on the issues before them. *Burton*, 338 Ill. App. 3d at 415. "The trial court has discretion to determine the proper character and scope of argument, and every reasonable presumption is indulged that such discretion was properly exercised." *Cloutier*, 156 Ill. 2d at 507.

Even if improper, a prosecutor's remarks during opening will rise to the level of reversible error only if "the complained-of remarks engender substantial prejudice such that the result of the trial would have been different had the comments not been made." *People v. Moore*, 358 Ill. App. 3d 683, 692 (2005); *Burton*, 338 Ill. App. 3d at 415 (an error in opening is reversible only if "it is impossible to say whether or not a guilty verdict resulted from those comments"); *Cloutier*, 156 Ill. 2d at 507 (an error in opening is reversible only if "the result would have been different absent the complained-of remark"). As noted above, since defendant failed to preserve any issues regarding opening statements, we will review the alleged errors only for plain error. *Cloutier*, 156 Ill. 2d at 506 (plain error review applies to unpreserved error in opening statement).

With respect to the State's opening remarks, defendant claims that the following three sentences constituted misconduct:

"It is a simple case. And quite honestly, the most difficult thing you will have to do today is figure out the difference between, oh,

my partner and I, the Judge and I, and my partner and I. That's how easy this case is."

Defendant claims that the above three sentences constituted misconduct, because these remarks (1) misstated the burden of proof; and (2) aligned the prosecutor with the court, creating an impermissible "us versus them" mentality.

Expressing an opinion that a case is "simple" does not misstate the burden of proof. These remarks do not even refer to or discuss the burden of proof. "Although a prosecutor may not express his [or her] personal opinion or argue facts that are not in evidence, he [or she] may offer an opinion based on the record." *Moore*, 358 Ill. App. 3d at 694.

The words "the Judge and I" are the only words which can even, arguably, be said to align the prosecutor with the trial court; and these 4 words in a 12-page opening statement do not rise to a level of misconduct. "[I]ncidental and uncalculated remarks in opening statement cannot form the basis of reversal." *Cloutier*, 156 Ill. 2d at 507.

Defendant also claims that the prosecutor committed misconduct by improperly bolstering the deputy sheriff witnesses, with the following remarks:

"Yesterday when you came here for your jury duty, the judge introduced himself to you. He had my partner and me introduce ourselves to you. And you saw the sheriffs in their uniform conducting various activities.

You saw one sheriff go out and give you your checks. You saw her meet you outside and tell where [sic] you to. When you came into the building, you may have been yelled at by one of [the] sheriffs, empty your pocket, go here, go stand over there.

\* \* \*

Then you may have another branch of the sheriff's department, maybe you heard of Cook County Sheriff's Police. What do they do that's different from the sheriffs here. They investigate crimes that occur county wide that may cross over to other suburbs and they could be any kind of crimes. They could be a serial murder crime or something as simple as damage to a house.

\* \* \*

So, in short, there are a number of different deputies that are assigned to Cook County sheriffs [sic] department and each of them have their duties to perform.

And you see how important their duties are. Because imagine what this courthouse would be like if the sheriffs didn't do their activities correctly."

In support of his claim, defendant cites *People v. Ford*, 113 Ill. App. 3d 659 (1983), and *People v. Gutirrez*, 205 Ill. App. 3d 231 (1990). These cases are not similar to the case at bar.

First, in *Ford*, the appellate court found that the prosecutor's remarks "exceeded the boundaries of proper argument," when the prosecutor repeatedly stated that " 'on the one hand' " there was the testimony of a deputy sheriff, while " 'on the other [hand]' " there was the testimony of defendant, " 'a drug addict.' " *Ford*, 113 Ill. App. 3d at 661, 662. By contrast, in the above-quoted remarks, the prosecutor did not disparage the defendant and did not draw any comparisons between the principal witnesses.

Second, defendant cited *Gutirrez*, for the proposition that a prosecutor may not suggest that the jurors may become "potential victims of defendant." *Gutirrez*, 205 Ill. App. 3d at 263. The prosecutor in *Gutirrez* stated " '[h]ow many of you, ladies and gentlemen, getting into your automobile, put your hands in the pockets, making yourselves [potential] victim[s] of this man.' " *Gutirrez*, 205 Ill. App. 3d at 249. By contrast, in the case at bar, the prosecutor never stated that the jurors could become defendant's next victims.

In addition, the trial court instructed the jury before trial that the arguments of counsel are not evidence, and that the jurors should not consider them as evidence. Prior to the opening statements, the trial court instructed the jury: "The opening statements are not evidence [b]ut are merely to aid you in understanding the significance of the evidence when it is introduced." At the end of the defendant's opening statement, the trial court again instructed the jury: "Ladies and gentlemen, the purpose of an opening statement is to outline the evidence that the parties expect to show. It is not evidence, and you should not consider it as evidence." The jury is presumed to follow instructions. *People v. Sutton*, 353 Ill. App. 3d 487, 501 (2004); *Burton*, 338 Ill. App. 3d at 417; *Arroyo*, 339 Ill. App. 3d at 154 ("it is a factor to be considered in determining the prejudice to defendant").

For the foregoing reasons, we find that the prosecutor's opening remarks did not constitute misconduct.

### c. Cross-Examination of Defendant

Defendant claims that the prosecutor used "trick questions" while cross-examining defendant, during the following three exchanges.

During the first exchange, the prosecutor posed the following questions:

"PROSECUTOR: Okay, so it is your testimony that Officer Lewis is the only one telling the truth, is that correct?

DEFENDANT: Officer Lewis is the only one who told the truth.

PROSECUTOR: So when he said he heard his partner say, 'He punched her.' That was the truth, right?

DEFENDANT: He said he heard his partner say that.

PROSECUTOR: So he is telling the truth, right?

DEFENDANT: He said he heard his partner say that. He is only listening to what his partner said.

PROSECUTOR: You heard how he said he came in and shoved one of the deputies away. You heard him say that, right?

DEFENDANT: Yes, I did.

PROSECUTOR: And that was the truth?

DEFENDANT: He is a big guy. I am pretty sure just him coming into the detainee lockup with fifteen other guys, and it's—it couldn't even hold fifteen guys."

On appeal, defendant claims that the question (quoted above) about whether Lewis heard his partner say that defendant punched a female deputy sheriff was a trick question, because the question made it seem as though defendant agreed that Bonarek had witnessed defendant's punch. However, if it was a trick question, defendant did not fall for it. Defendant stated that Lewis was "only listening to what his partner said," thus implying that "his partner" Bonarek was lying, not Lewis.

On appeal, defendant claims that the question about whether it was truthful that Lewis had pushed Young out of the way was misleading, because there was a discrepancy in the testimony between Young and Lewis on this point. Young testified that a fleeing inmate had knocked him down, while Lewis testified that he was actually the one who shoved Young out of the way. However, whether the question was or was not intended as a trick question, defendant simply did not answer it. Defendant responded only that Lewis was "a big guy." Thus, no harm was done.

During the second exchange, the prosecutor posed the following questions:

"PROSECUTOR: And you would agree with me then that if somebody punched a deputy while on duty that that would be an aggravated battery to a peace officer. You would agree with me there?

DEFENDANT: Yes, if somebody did that. Yes, it would.

PROSECUTOR: If somebody did that, that is an aggravated battery to a peace officer?

DEFENDANT: Yes."

On appeal, defendant claims that the above-quoted exchange was misleading because it seemed like an admission by defendant to the charge. However, defendant, in essence, denied the charge by stating that if "somebody" hypothetically did that, it would be battery, but he steadfastly maintained throughout the trial that he did not. Thus, the result was not misleading.

During the third exchange, the prosecutor posed the following questions:

"PROSECUTOR: You heard Officer Bonarek yesterday say how he came out first. And as he was coming in, some other deputies were joining him. You heard Officer Bonarek say that, correct?

DEFENDANT: I heard Officer Bonarek say he was the first one there.

PROSECUTOR: Right. And then by the time he got in, some Skokie deputies were helping him out. You heard him say that yesterday, didn't you?

DEFENDANT: No, I didn't.

PROSECUTOR: Well, did you only hear what you think helps you?

DEFENDANT: No, I heard him say that when he came in he arrested the situation."

It was an improper and argumentative question to ask, "[D]id you only hear what you think helps you?" However, defendant was not fazed by the question, replying instead with his recollection of Bonarek's testimony, which differed from the prosecutor's recollection. During jury instructions, the trial court informed the jury that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Since the jury is presumed to follow instructions, the jury presumably disregarded the statement or argument that it found was not based on the evidence. *Sutton*, 353 Ill. App. 3d at 501; *Burton*, 338 Ill. App. 3d at 417; *Arroyo*, 339 Ill. App. 3d at 153-54 ("it is a factor to be considered in determining the prejudice to defendant").

For the foregoing reasons, we find that these allegedly trick questions did not deprive defendant of a fair trial.

### d. State's Rebuttal Case

Defendant claims that certain of the prosecutor's questions during its rebuttal case were misleading and that one answer violated the rule against hearsay.

The admission of evidence is generally within the sound discretion of the trial court, and this court will review only for an abuse of discretion. *People v. Johnson*, 385 Ill. App. 3d 585, 607 (2008); *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006). An abuse of discretion occurs "only where the [trial court's] ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *Purcell*, 364 Ill. App. 3d at 293. In addition, as discussed above, we will review only for plain error, because defendant failed to preserve the alleged error, by failing to object either at trial or in a posttrial motion. *Woods*, 214 Ill. 2d at 470; *Piatkowski*, 225 Ill. 2d at 564.

In its rebuttal case, the State called two witnesses: Deputy Sheriff Rocco Tudisco; and Deputy Sheriff Deborah Hoffman. On appeal, defendant complains only about the questions asked of Deputy Sheriff Tudisco. Defendant's claims focus on two areas of questions: (1) questions concerning the internal affairs department; and (2) questions concerning defendant's injury.

First, Deputy Sheriff Tudisco testified that he was interviewed by members of the internal affairs department of the sheriff's department concerning what did and did not happen to defendant on June 27, 2005. Tudisco testified that: the internal affairs officers told him that he would be exonerated; and no disciplinary action was taken against him.

On appeal, defendant claims that the questions about the internal affairs department were misleading because Tudisco was not involved in the actions that occurred inside the lockup area. Defendant also claims that Tudisco's report of what internal affairs officers told him was inadmissible hearsay.

While Deputy Sheriff Tudisco did not testify that he was present in the lockup area, he did testify, on rebuttal, that he was present immediately thereafter, as defendant was transported by elevator, to a room in the courthouse basement. Defendant had testified that, in the basement, his hands were handcuffed to his feet, and that he was left that way for hours. Thus, Tudisco was involved in the incident, as alleged by defendant, and the State's questions were not misleading.

Tudisco's testimony that he was exonerated by the internal affairs investigation was hearsay. But any error did not rise to the level of plain error, where defendant had already opened the door, during his own case, to hearsay testimony about whether the case was or was not still pending.

Second, Tudisco testified (1) that defendant bore no visible marks before he was transported to jail, immediately after the incident; and (2) that both on the day of the incident and on the morning of the following day, Tudisco asked defendant whether he wanted medical attention, and defendant said no.

On appeal, defendant claims that these questions about defendant's injury were misleading. Defendant argues that Tudisco observed defendant when defendant first arrived at the Skokie courthouse, and before the incident. However, defendant's argument is factually wrong. Tudisco testified that he observed defendant, immediately after the incident, as defendant was transported on the elevator, to a room in the basement. Thus, Tudisco's testimony about the defendant's lack of marks is highly relevant to defendant's claims that he had just been attacked by other deputy sheriffs.

Defendant also claims that Tudisco's testimony about defendant's refusal of medical care on the following day was misleading, because defendant had already received medical care, so he did not need additional care. Even assuming *arguendo* that defendant had already received some medical care, his refusal of medical care on the following day is still relevant to his claims of extreme abuse at the hands of the deputy sheriffs. In addition, Tudisco testified that defendant refused an offer of medical care on the same day as the incident.

For the foregoing reasons, we do not find that the complained-of questions in the State's rebuttal case were misleading; and any alleged error did not rise to the level of plain error.

### e. Closing Statement

Defendant claims that the prosecutor's remarks during the prosecutor's rebuttal closing constituted reversible error.

It is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion. Our supreme court has held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). However, the supreme court in *Wheeler* cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), in which the supreme court had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument are within the trial court's discretion and will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 128, 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Emerson*, 189 Ill. 2d 436, 488 (2000); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned: "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004), *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. The First District has applied an abuse of discretion standard, while the Third and Fourth Districts have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill.

App. 3d 306, 313 (1st Dist. 2007), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist. 2008), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), and *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist 2008). However, we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard.

In addition, as previously discussed, we will review only for plain error, because defendant failed to preserve the alleged error by objecting either at trial or in a posttrial motion. *Woods*, 214 Ill. 2d at 470; *Piatkowski*, 225 Ill. 2d at 564.

When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 122, *People v. Johnson*, 208 Ill. 2d 53, 113 (2003), *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

Reversal is warranted only if the prosecutor's remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123, *Johnson*, 208 Ill. 2d at 64, *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice"). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *Wheeler*, 226 Ill. 2d at 123.

In the case at bar, defendant complains about the following remarks of the prosecutor in the State's rebuttal closing:

"The defendant was completely protected considering five deputies on him and still no one laid a hand on him despite what he just did. And the defendant will have you believe, okay, this is some grand conspiracy. Some grand frame up. This is the great frame up that Deputy Hoffman cannot frame a picture. Let's talk [about] why this is not a conspiracy.

First of all, this is a busy courtroom. Do you think that she wants to waste her time dealing with, let me see. Who can I pick on to put a case on? How about—hey, how about Prentice Phillips? Does it make sense to you that you pick someone who is there by his own account for a misdemeanor? Sure[ly] there is some more violent felon[ ] that she can pick to make her story more credible. Does it make sense to you that she would pick the defendant? Does it also make any sense to you that she is going to lie? That she is going to start bringing various branches of the Sheriff's Department?

You heard how careful they are about how you are responsible for your prisoners or your inmates when they are in your custody. And before you hand them over to someone else, that someone else will not take them if there is a mark on them. Because you know what? They do not want to be liable either."

In support of this claim, defendant cited *People v. Montgomery*, 254 Ill. App. 3d 782 (1993). In *Montgomery*, the trial court found that defendant was denied a fair trial when the prosecutor exhorted the jurors to " '[h]ave faith in our system' " and in the police officers " 'who go out day in and day out' " to " 'risk their lives for people like you' " and who would not risk their " 'career[s]' " by lying. *Montgomery*, 254 Ill. App. 3d at 793-94. In the case at bar, the prosecutor should not have referred to the officer's potential liability. However, her remarks lacked the inflammatory or emotional character of the prosecutor in *Montgomery* who exhorted the jurors to " 'have faith' " in officers who " 'risk[ed] their lives.' "

Defendant also claims that, in the State's rebuttal closing, the prosecutor misstated Deputy Sheriff Tudisco's testimony. The prosecutor stated:

"[Defendant] doesn't know who Tudisco is? Yet, he sees them [*sic*] the day of and refuses medical attention from him. The next day and refuses medical attention from him. Oh, yeah and threatens to sue him."

During cross-examination, Tudisco testified that defendant refused medical care, both "the day of the incident and the morning after the incident." Tudisco testified during both direct and cross-examination that defendant threatened to sue Tudisco for a million dollars. Thus, the quoted remarks contained no misstatement by the prosecutor.

Under either an abuse of discretion or a *de novo* standard of review, the prosecutor's closing remarks did not constitute reversible error; and they certainly did not rise to the level of plain error.

### f. Cumulative Error

Defendant claims that, even if each individual act of prosecutorial misconduct did not warrant a new trial, the "cumulative effect of errors" certainly did. *People v. Johnson*, 208 Ill. 2d 53, 64 (2004) ("cumulative effect of errors" may warrant reversal). However, where, as here, "the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error." *Moore*, 358 Ill. App. 3d at 695. Our review of the entire record does not disclose prosecutorial misconduct warranting a new trial.

### CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction.

First, we find that the State's evidence was sufficient to prove that defendant acted intentionally and knowingly, rather than inadvertently. Second, we find that defendant was not denied his sixth amendment right to counsel. The trial court did not abuse its discretion when it found that defendant's waiver of this right was clear and unequivocal, and the trial court substantially complied with the admonishments required by Supreme Court Rule 401(a). 134 Ill. 2d R. 401(a). Third, we find that the trial court did not abuse its discretion when it denied defendant's request for standby counsel. Fourth, we find that defendant was not denied a fair trial by the claimed prosecutorial misconduct.

Affirmed.

WOLFSON and HALL, JJ., concur.