2019 IL App (1st) 161564-U
No. 1-16-1564

Third Division
December 11, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 7241 |
| | ) | |
| MUSTADIN MUADINOV, | ) | Honorable |
| | ) | James Karahalios, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated battery is affirmed where there was sufficient evidence that he knowingly caused bodily harm to the victim. This court lacks jurisdiction to consider defendant's arguments on a merged, unsentenced count of resisting or obstructing a peace officer.

¶ 2    Following a jury trial, defendant Mustadin Muadinov[1] was found guilty on two counts of aggravated battery and one count of resisting or obstructing a peace officer. The trial court merged

_____

[1] At trial, defendant spelled his first name as "Musatdin." However, we adopt the spelling used in the indictment, the proceedings in the trial court, and defendant's notice of appeal.

the counts into a single count of aggravated battery based on bodily harm and sentenced defendant to four years in prison. Defendant appeals, arguing that the State failed to prove him guilty of aggravated battery beyond a reasonable doubt. He also contends that, if this court were to reverse his conviction for aggravated battery, we should also reverse his conviction for resisting or obstructing a peace officer for various reasons. We affirm defendant's aggravated battery conviction, and find that we lack jurisdiction to consider his arguments regarding his resisting or obstructing conviction.

¶ 3                                  I. BACKGROUND

¶ 4     Defendant was charged by indictment with two counts of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2014)) against Norridge police corporal Vaughn Watts, and one count of resisting or obstructing Watts in the course of his official duties. (720 ILCS 5/31-1(a-7) (West 2014)).

¶ 5     At trial, Watts testified that he was on patrol in a marked vehicle and full police uniform on April 7, 2015. At approximately 11:30 p.m., he noticed a group of 10 to 15 men standing outside of a hookah lounge in a "mini-mall" located in the 5000 block of Cumberland Avenue in Norridge, Illinois. There were approximately eight "no loitering" signs posted throughout the mini-mall's parking lot.

¶ 6     Watts drove towards the group, rolled down his window, and told them that they needed to leave. Most of the men began walking toward their respective vehicles, but defendant asked Watts why they were required to leave. Watts explained that they were loitering in violation of the posted signs. Defendant continued to insist that he "didn't do anything wrong and there was no reason for him to leave" until one of the other men in the group pulled him away.

¶ 7   Watts then drove to a Dunkin' Donuts located in the same mini-mall to purchase a cup of coffee. He stopped his vehicle by the sidewalk out front to speak to two men, later identified as Ahmad Fahoum and Maen Fahoum, whom he knew as regulars at the Dunkin' Donuts. As Watts spoke to Ahmad and Maen through his passenger's side window, defendant approached the driver's side window on foot and stated that Watts "needed to learn how to talk to people." Watts ordered defendant to step away from his vehicle, but defendant did not comply. Watts could not recall whether it was Ahmad or Maen who came around to the driver's side and walked defendant to the sidewalk in front of the Dunkin' Donuts. Watts exited his vehicle and approached defendant to further explain why he needed to vacate the parking lot. Defendant "continued to argue [that] he didn't do anything wrong," so Watts asked defendant for his identification in order to write him a citation for loitering. Defendant stuck his hands in his jacket pockets and did not produce his identification. Watts ordered defendant to show his hands, which defendant did for "[t]wo seconds" before returning them to his pockets. Watts told defendant that he would have to determine his identity through fingerprinting at the police station if he could not provide his identification. Defendant replied, "F*** jail."

¶ 8   Watts radioed for backup, grabbed defendant's forearms, and told him to put his hands behind his back. Defendant removed his hands from his pockets and grabbed Watts' vest in a "very aggressive manner." The two pushed and pulled on each other until defendant fell to the ground. Watts ordered defendant to stay down, but defendant stood up and regained hold of Watts' vest. As they continued to wrestle on the sidewalk, defendant eventually knocked Watts off balance, causing Watts to fall to the ground and into a wall. Watts rose to his feet, drew his taser, and told defendant that he would tase him if he did not get on the ground. Defendant did not comply and

Watts fired the taser at him. However, it was unsuccessful because the barbs got stuck in defendant's jacket. Watts "reengaged with [defendant] physically," striking him in the left ear with the handle of the taser. Watts and defendant continued to struggle while defendant ignored repeated orders to get on the ground. Officer Zeljka Ljubicic arrived at the scene and also ordered defendant to go to the ground. When defendant did not comply, the officers forcibly tackled him. Watts secured defendant's head on the ground while Ljubicic ordered him to place his hands behind his back multiple times. Defendant instead hid his hands underneath his body, but the officers were eventually able to force him into handcuffs.

¶ 9    After securing defendant in the lockup at the police station, Watts requested medical attention for pain he felt in his left shoulder. Paramedics drove Watts to the hospital, where tests revealed a shoulder sprain. Watts testified that the injury occurred when defendant pushed him onto the ground and into the wall during the struggle.

¶ 10    On cross-examination, Watts testified that defendant struck him once in the head during the struggle, though he could not recall when or whether it was with an open or closed fist. Watts did not tell Ljubicic that defendant struck him, but he did tell another officer, Charles Tortorello. Watts did not remember telling the paramedics that his shoulder was injured because he "fell" while trying to make an arrest.

¶ 11    Ljubicic testified that she arrived at the scene around 11:45 p.m. and saw Watts holding defendant against a wall. Ljubicic tried to grab defendant's arms and repeatedly ordered him to get on the ground, but he continued to fight her and Watts. Ljubicic then drew her taser and told defendant that she would tase him if he did not get on the ground. Defendant went down to his knees but resisted the officers' attempts to handcuff him by keeping his arms underneath his body.

Defendant eventually placed his hands behind his back after being ordered to do so "multiple times." He was handcuffed and transported to the police station.

¶ 12     The State also published two videos of the incident, one captured with a cell phone by one of the men who attended the hookah lounge with defendant, and the other by a security camera outside the Dunkin' Donuts. The cell phone video shows Watts and defendant wrestling on the sidewalk in front of the Dunkin' Donuts in the presence of several bystanders. Watts and defendant each have a two-handed grip on the other's torso and are pushing and pulling each other around the sidewalk. Approximately five seconds into the video, they continue to struggle while defendant's back is to the front window of the Dunkin' Donuts. Although their upper bodies are obscured by one of the bystanders standing in front of the camera, the video depicts Watts leave his feet and crash into the window as defendant steps to the side without releasing his grip on Watts. Watts and defendant retain their respective grips on each other while Watts attempts to stand up. When Watts rises to his feet, he draws his taser and tells defendant to "back up or you will be tased." Watts fires his taser into defendant's jacket, but it does not seem to affect him. Watts then lunges toward defendant, striking him in the left ear with the taser. Defendant appears to swing his hand towards Watts's head, but it is not clear whether he makes contact. They begin to grapple again, and Watts pins defendant's back against the front window of the business next to the Dunkin' Donuts. Ljubicic arrives and the officers repeatedly order defendant to "get down on the ground." Defendant steps away from the wall and briefly struggles with both Watts and Ljubicic. Watts pushes defendant against the wall again, and Ljubicic tells defendant that she will tase him if he does not get down on the ground. Defendant goes to his knees and Watts secures his head against the ground. Ljubicic forces defendant's hands out from beneath his body and puts

him in handcuffs. As the officers pull defendant upright, Watts tells him, "All this for nothing. Because you're too f*** proud." Watts later states, "All I did was ask you to go. You don't tell me what I'm doing."

¶ 13    The Dunkin' Donuts security footage, which does not have audio and is of poorer quality than the cell phone video, shows Watts arrive at the Dunkin' Donuts and speak to Ahmad and Maen through his passenger's side window. One of the men walks around to the driver's side of Watts' vehicle and immediately returns to the sidewalk with defendant. Watts exits his vehicle and follows them to an area of the sidewalk that is blocked from the camera by a stone pillar. After approximately three minutes, defendant and Watts emerge from behind the pillar, wrestling with each other as depicted in the cell phone video. Approximately 20 seconds later, Watts tumbles to the ground and into the front window of the Dunkin' Donuts, though it is difficult to make out many details in the blurry video. Watts stands up, and the rest of the struggle occurs off-camera.

¶ 14    The State rested, and the defense moved for a directed verdict on all counts, which the court denied.

¶ 15    The defense then entered a stipulation that Tortorello would testify that he interviewed Watts following the incident, and that Watts told him he did not recall whether defendant threw any punches at him. Watts did not mention being struck in the head during the struggle.

¶ 16    Paramedics Martin Lupo and Frederick Ford both testified that they drove Watts to the hospital following the incident. Lupo took Watts's vitals while Ford questioned him about his injuries. Ford testified that Watts told him that he injured his shoulder during an arrest, but neither Lupo nor Ford recalled Watts stating that he "fell" while trying to make an arrest.

¶ 17    Shakir Muratov, who described himself as defendant's "distant cousin," testified that he attended the hookah lounge with defendant and several others on the night of the incident. When the lounge closed around midnight, the group exited and began warming up their cars in the parking lot. Approximately two or three minutes later, a police officer arrived and told them that they needed to leave. Defendant stated, "We're just warming up [our cars], we're going to leave, *** and we're not doing anything wrong." The officer then drove away to a nearby Dunkin' Donuts without saying anything else. Defendant also walked toward the Dunkin' Donuts to greet Ahmad and Maen, whom he saw on the sidewalk out front. Muratov followed defendant shortly thereafter, and arrived as Watts was outside of his vehicle, asking defendant for his identification. Defendant stated that he did not have any identification and that he "didn't do anything." The officer ordered defendant to turn around so that he could handcuff him, but defendant reiterated that he had done nothing wrong. The officer grabbed defendant by the forearms and "launch[ed]" him toward the front window of the Dunkin' Donuts, causing the officer to slip and fall in the process. Muratov testified that defendant's hands were at his sides at this time and that defendant did not push the officer.

¶ 18    The officer stood up, drew his taser, and ordered defendant to get on the ground. Defendant did not obey. The officer struck defendant in the left ear with his taser, causing it to bleed. A female officer then arrived, and the two officers forced defendant to the ground and into handcuffs. Muratov denied seeing defendant strike either officer during the struggle.

¶ 19    On cross-examination, Muratov testified that he never saw defendant lay his hands on the officers. Muratov also denied that defendant was "struggl[ing]" or "wrestling" with the officers, but acknowledged that defendant resisted their attempts to push him to the ground.

¶ 20     Ahmad testified that he and Maen went to the Dunkin' Donuts for coffee on the night of the incident. At around midnight, they stepped outside for Maen to smoke a cigarette. Watts, whom Ahmad knew from the Dunkin' Donuts, arrived in a police vehicle. Ahmad and Maen spoke to Watts through Watts's passenger side window until defendant, whom Ahmad also knew, approached the driver's side window. Ahmad did not recall whether defendant said anything to Watts, but remembered that Watts asked defendant for his identification. Defendant explained that he did not have any identification, and Watts told him, "[I]f I find it on you, *** you're going to jail." Watts then exited his vehicle and ordered defendant to place his hands behind his back. Defendant refused, stating, "Why should I put my hand[s] behind my back if I didn't do anything wrong?" Watts grabbed defendant by the shoulders and "wrestl[ed] around" with him while repeatedly ordering him to get on the ground. Defendant did not strike Watts during the struggle, but Watts pushed, kicked, and tried unsuccessfully to hit defendant's head into a wall. After several minutes of struggling, Watts fired his taser at defendant, but "it didn't work." The officer approached defendant again and struck him with the taser. Defendant and Watts went "back and forth" some more until a female officer arrived. Defendant then went to the ground voluntarily.

¶ 21     On cross-examination, Ahmad acknowledged that he initially agreed to go to the police station for an interview, but did not show up at the scheduled time. When a detective called to reschedule, Ahmad refused to speak to him.

¶ 22     On redirect examination, Ahmad explained that he did not speak to police because he did not want to miss work or come between Watts, his friend, and defendant, whom he considered to be "a brother." Ahmad only testified under subpoena.

¶ 23    Defendant testified through a Russian interpreter that he arrived at the hookah lounge with Muratov and other friends at around 9 p.m. on the day of the incident. They left shortly before midnight and waited in the parking lot while their cars warmed up. Watts arrived approximately 10 minutes later and told them that they needed to leave. Defendant replied that they would leave once their cars were warm and they said their goodbyes. Watts again stated that defendant and his friends needed to "get the f*** out of here right now." Defendant told Watts that they would leave, but that he should not use profanity or that "tone of voice." Watts responded, "Don't f*** teach me how I [am] supposed to talk with people." Defendant stated, "I'm human, you cannot talk to me like that." Watts told defendant to "stop using that s***," apparently under the mistaken belief that defendant had been using drugs. Watts then drove to the Dunkin' Donuts, which was approximately 160 feet away.

¶ 24    Defendant noticed Ahmad and Maen in front of the Dunkin' Donuts and decided that he "couldn't leave without saying good-bye to them as always." Defendant walked to the Dunkin' Donuts, where Watts was sitting in his vehicle with the windows rolled down. Defendant approached the driver's side of the vehicle and asked Watts why he had spoken to him "like that" by the hookah lounge. Watts replied, "Don't teach me how to do my job," and, "[G]et away from my car." Defendant then joined Ahmad and Maen on the sidewalk by the passenger's side. Watts exited his squad car and asked defendant for identification. After checking his pockets, defendant informed Watts that he did not have any. Watts responded that he would have to take defendant to the police station, and defendant asked why. Watts ordered defendant to place his hands behind his back and "attempted to arrest" him. Defendant stated that he "was not going to give [his] hands" because he believed being fingerprinted at the police station would impair his ability to find work.

Watts grabbed defendant's arms and pushed him headfirst into the window of the Dunkin' Donuts. Watts attempted to take defendant to the ground, but defendant remained on his feet because he "thought that police officers should not be that brute." Defendant separated himself from Watts, and Watts fired his taser at him. The taser did not work. Watts then struck defendant with the taser, causing his ear to bleed. A female officer arrived, and defendant got on the ground. He was handcuffed after voluntarily giving the officers his hands.

¶ 25    On cross-examination, defendant denied stating, "F*** jail" or ignoring Watts's order to remove his hands from his pockets before the struggle. However, defendant acknowledged that he did not put his hands behind his back or get on the ground when ordered to do so because he believed that Watts had no reason to take him to the police station. Defendant decided to "no longer resist" once the female officer arrived. He got on the ground, but initially did not place his hands behind his back because "under such stress [he] couldn't immediately follow orders."

¶ 26    After arguments, the jury found defendant guilty of resisting or obstructing a peace officer and both counts of aggravated battery. Following a sentencing hearing, the trial court merged all three findings of guilt into a single count of aggravated battery and imposed a term of four years' imprisonment for aggravated battery.

¶ 27    II. ANALYSIS

¶ 28            A. Sufficiency of the Evidence for Aggravated Battery

¶ 29    On appeal, defendant argues that the State did not prove he committed the "actus reus" for aggravated battery beyond a reasonable doubt. In particular, defendant contends that the video evidence shows that Watts injured his shoulder by falling into the wall on his own, and not as a result of defendant's conduct.

¶ 30     Where, as here, a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35. Thus, a reviewing court must not retry the defendant or substitute its own judgment for the trier of fact's on issues involving the weight of the evidence or witness credibility. *People v. Bradford*, 2016 IL 118674, ¶ 12. Instead, a reviewing court will draw all reasonable inferences in the State's favor, and will reverse a conviction only where the evidence is "so unreasonable, improbable, or unsatisfactory" that a reasonable doubt of the defendant's guilt remains. *Newton*, 2018 IL 122958, ¶ 24.

¶ 31     To convict defendant of aggravated battery as charged here, the State was required to prove that, without lawful justification, defendant knowingly caused bodily harm to Watts while aware that Watts was a police officer performing his official duties. 720 ILCS 5/12-3.05(d)(4)(i) (West 2014). Defendant does not dispute that he knew Watts was a police officer, that he struggled with Watts, or that Watts suffered bodily harm to his left shoulder by making contact with a wall during the struggle. Instead, defendant argues that there was insufficient evidence that his conduct was what caused Watts to hit the wall.

¶ 32     However, a rational trier of fact could have found defendant responsible for Watts's injury. Notably, Watts testified that he injured his shoulder because defendant knocked him off balance and into the wall while wrestling with him. The positive testimony of a single credible witness is sufficient to sustain a conviction, even where such testimony is contradicted by the defendant.

*Gray*, 2017 IL 120958, ¶ 36. We also note that both videos introduced into evidence generally corroborate Watts's account of the struggle. Even so, defendant argues that the video evidence shows that Watts fell into the wall on his own accord, thus belying Watts's testimony that defendant pushed him. In support of his argument, defendant identifies several still images from the cell phone video that he contends demonstrate that Watts slipped on his own while pushing defendant towards the wall. However, played in its full context, the video shows that Watts and defendant were engaged in a violent struggle with each man pushing and pulling on the other. Defendant maintained a two-handed grip on Watts's vest before, during, and immediately after Watts crashes into the wall. While the precise moment Watts loses his footing is somewhat obscured by a bystander in front of the camera, the video does not definitively rebut Watts's testimony as defendant claims, even when viewed frame-by-frame. Similarly, although the security footage is of lesser quality, it also depicts defendant and Watts wrestling with each other immediately before Watts tumbles into the wall. Thus, contrary to defendant's assertions, the video evidence did not prevent a rational jury from crediting Watts's testimony.

¶ 33 Defendant next argues that the State failed to prove that he knowingly caused Watts bodily harm beyond a reasonable doubt. More specifically, defendant contends that Watts was the "aggressor" of the physical struggle, and that any contact he made with Watts was merely "incidental as he attempted to escape Watts' grasp."

¶ 34 As noted, the State was required to prove beyond a reasonable that defendant acted "knowingly" as an element of aggravated battery. 720 ILCS 5/12-3.05(d)(4)(i) (West 2014); *People v. Phillips*, 392 Ill. App. 3d 243, 258 (2009). A person acts "knowingly" when he acts willfully or while "consciously aware" that a particular result is "practically certain to be caused

by his conduct." 720 ILCS 5/4-5(b) (West 2014). The State need not prove that a defendant intended a particular injury to satisfy the knowing conduct requirement. *Lattimore*, 2011 IL App (1st) 092328, ¶ 44. Rather, it is sufficient for the State to demonstrate that the injury caused was a "'natural and probable consequence'" of the defendant's intentionally unlawful conduct. *Id.* (quoting *People v. Isunza*, 396 Ill. App. 3d 127, 132 (2009)). Because direct evidence of a defendant's mental state is rarely available, a defendant' s intent is usually proven through circumstantial evidence. *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 10. A defendant's intent may be inferred from the circumstances surrounding the incident, the severity of the victim's injuries, and the defendant's conduct itself. *People v. Coleman*, 311 Ill. App. 3d 467, 473 (2000).

¶ 35    Here, there was ample circumstantial evidence to support an inference that defendant acted knowingly. The evidence established that defendant argued with Watts by the hookah lounge before walking across the parking lot to reengage with him outside the Dunkin' Donuts. Defendant ignored Watts's instructions to remove his hands from his pockets and stated, "F*** jail" when Watts told him that he would have to go to the police station. When Watts attempted to remove defendant's hands from his pockets, defendant grabbed Watts's vests with both hands in a "very aggressive manner." Defendant then wrestled with Watts and maintained his grip on Watt's vest even after Watts crashed into the wall. We also note that defendant continued to fight Watts after Watts rose to his feet, threatened to tase defendant, and repeatedly ordered defendant to get on the ground. Watts's account of the prolonged struggle with defendant was corroborated by two separate videos. Although defendant maintains that he only touched Watts to free himself from Watts' grasp, a reasonable jury could have easily inferred that defendant acted knowingly under these circumstances. See *Lattimore*, 2011 IL App (1st) 092328, ¶ 45 (the defendant repeatedly

struggled with store personnel while attempting to escape after being stopped for shoplifting); *Phillips*, 392 Ill. App. 3d at 259 (the defendant, an inmate, struck a deputy sheriff after angrily yelling about his bond, refusing to enter his cell, and swinging his arms around).

¶ 36    In sum, we cannot say that it was irrational for the jury to find that defendant knowingly caused Watts bodily harm by pushing him into the wall. Consequently, defendant's conviction for aggravated battery is affirmed.

¶ 37    B. Resisting or Obstructing a Peace Officer

¶ 38    As a final matter, we note that, in his initial brief on appeal, defendant also challenged his conviction for resisting or obstructing a peace officer in several respects. In particular, defendant contended that (1) there was insufficient evidence that he materially impeded Watts in an authorized act, (2) the State failed to prove that he acted knowingly, (3) his conduct was not the proximate cause of Watts's injury, (4) the indictment was fatally vague, (5) the trial court abused its discretion in refusing to give certain jury instructions, and (6) the State made improper comments about what Watts was authorized to do during its closing argument.

¶ 39    In response, the State argued that this court lacks jurisdiction to entertain these arguments because, as defendant was not sentenced on the resisting or obstructing count, there is no final judgment for us to review. In his reply brief, defendant acknowledges that this court generally lacks the jurisdiction to review merged, unsentenced findings of guilt, but argues that judicial economy would be best served by addressing his claims if his aggravated battery conviction was vacated. Thus, defendant reiterates the substantive arguments in his initial brief on appeal, but with the important caveat that we should address them only if we grant him relief from his aggravated battery conviction.

- 14 -

¶ 40    It is well-established that, aside from certain exceptions not relevant here, this court's jurisdiction in criminal cases extends only to final judgments of the trial court, and that there is no final judgment on a count unless a sentence is imposed. *People v. Relerford*, 2017 IL 121094, ¶ 71. Here, the trial court did not impose a sentence for resisting or obstructing a peace officer, but rather merged that count into defendant's aggravated battery conviction. We therefore agree with the State that we lack jurisdiction to consider defendant's arguments pertaining to the resisting or obstructing charge. See *People v. Goodwin*, 2018 IL App (1st) 152045, ¶¶ 58-63 (declining to review the defendant's challenges to a finding of guilt on a merged, unsentenced count).

¶ 41    Additionally, as noted above, defendant does not contest that the absence of a sentence for resisting or obstructing a peace officer creates a jurisdictional bar to an appeal of that count. Instead, he maintains that we would not be precluded from entertaining the merits of his arguments if his aggravated battery conviction was vacated. However, as we have affirmed defendant's aggravated battery conviction, we need not address his argument pertaining to his merged conviction for resisting or obstructing a peace officer.

¶ 42                        III. CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 44    Affirmed.