2020 IL App (1st) 163288-U

SECOND DIVISION
June 30, 2020

No. 1-16-3288

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 15549 |
| LANCE HENDERSON, | ) ) | The Honorable James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

*HELD*: Trial court did not commit error in allowing testimony from witness with respect to last thing she said to defendant before crimes occurred, as it was relevant and not prejudicial, and there was no error in the State's mention during closing argument of this witness' statement nor of the decedent's autopsy designation. Additionally, without individual error, there was no cumulative error so as to warrant reversal of defendant's convictions.

¶ 1    Following a jury trial, defendant-appellant Lance Henderson (defendant) was convicted of first degree murder and two counts of aggravated battery with a firearm. He was sentenced to 100 years in prison. He appeals, contending that he was denied a fair trial where the trial court erroneously allowed the State to introduce irrelevant and prejudicial evidence, and where the State improperly argued two remarks during closing argument purposefully designed to inflame the passions of the jury against him. He asks that we reverse his conviction and remand for a new trial. For the following reasons, we affirm.

¶ 2                                              BACKGROUND

¶ 3    The facts underlying this cause are not in dispute. The incident between the victims and defendant took place outside an apartment building at 5956 West Lake Street near Austin Boulevard in the early morning hours of July 21, 2012. It was preceded by an encounter with defendant and several witnesses only hours before. Victims Denzel Johnson and Jason Campbell were shot and injured, and victim Akil Partee was fatally shot and died at the scene.

¶ 4    Ruffin Powell testified that at about 11:00 p.m. on July 20, 2012, he was standing outside the building in its well-lit courtyard with his friends Mario Hardiman and Bryant McCullins. They saw a champagne-colored Buick parked across the street and noticed that the occupants inside were fighting: a man in the driver's seat was hitting a woman in the front passenger seat while a young boy was in the backseat. Powell heard the woman yell out to them to call 911 and saw the boy exit the car and walk into the street crying and screaming for his mother. Powell stated that Hardiman began calling the police as the three friends approached the car in an attempt to calm the man down; Powell identified the man as defendant. Defendant exited the car and confronted McCullins, but Powell stepped in between the two

men to separate them. Powell was close enough to defendant to smell alcohol on his breath; defendant said, "I'm drunk," and then returned to the car and yelled at the woman for getting the men involved in their "business." While McCullins comforted the boy, Hardiman intervened between defendant and the woman as defendant was trying to physically drag her out of the car. Following this, defendant and the boy got back in the car; as defendant drove away, he repeatedly told the men, "I will be back." Police arrived soon thereafter, and Powell, Hardiman and McCullins[1] told them what happened.

¶ 5        Powell further testified that about an hour or so later, at 12:45 a.m. on July 21, 2012, he was still outside the apartment building; McCullins had gone inside and Powell and Hardiman were now joined by other friends, including Johnson, Campbell and Partee. As they were talking, Powell saw a man wearing a black baseball hat walking through the alley toward them. When the man was about four to five feet away, Powell recognized him as defendant and saw that he had a gun. Defendant shot first at Hardiman, and Powell turned and ran through the courtyard. Powell heard several more shots. He was able to enter the apartment building, whereupon he heard Johnson calling to him from outside. Powell returned to the scene and saw Johnson and Campbell lying on the ground shot, but alive. Powell then checked on Partee, who was also shot and lying on the ground, but he did not respond. Police arrived and Powell gave a description of defendant. Powell was interviewed and later that day identified defendant from a lineup as both the shooter and the man in the Buick involved in the domestic incident shortly before the shooting.

¶ 6        Hardiman corroborated much of Powell's testimony. He testified that he was outside with Powell and McCullins when he saw people fighting in the Buick across the street; a

---

[1] None of the testifying witnesses knew defendant prior to these incidents.

woman was yelling to call the police and a boy was screaming. As Hardiman called 911, McCullins and Powell went over to the car and began talking to the driver, who Hardiman identified as defendant. Hardiman also approached to talk to him, and defendant got out of the car and came within inches of Hardiman's face. He then got back in the car and Hardiman heard him say he would be back as they drove off. Police arrived and Hardiman provided them with a description of the car and its license plate. Hardiman further testified that later, he was outside with Powell, Johnson, Campbell and Partee when he saw a man in a black baseball hat walking from the alley toward him. As the man got within four feet of him, Hardiman saw his face and recognized him immediately as defendant. Defendant pulled out a gun and fired. Hardiman ran from the scene and was able to get to a friend's porch where he called police. He returned to the scene when he saw police responding. Hardiman gave police a description of defendant and later viewed a lineup and identified him as both the shooter and the man in the Buick involved in the domestic incident before the shooting.

¶ 7    McCullins likewise corroborated much of the testimony of Powell and Hardiman. He testified that while he was outside on Lake Street with those friends, he saw a man and a woman in a parked Buick fighting. He saw a boy get out of the car and cry in the street and heard the woman yell for someone to call the police. Hardiman approached the Buick and encountered defendant, who came very close to him, and Powell stepped in between them. After the situation calmed down, defendant and the boy got back in the car with the woman and, as defendant drove off, McCullins heard him say he would be back. McCullins spoke about the incident to police when they arrived and he then went home. The following day, he identified defendant in a lineup as the man involved in the domestic incident.

¶ 8    Victims Johnson and Campbell testified about the shooting. Johnson stated that he was outside with the group when he saw a man with a black hat walking in the alley and coming toward them. The man approached Hardiman and shot at him first; he then shot at the group. As Johnson turned to run, he was shot in the spine and fell on his stomach, whereupon he saw the man shoot Partee and then chase and shoot Campbell. Campbell, too, testified that he was outside with the group when the man came up to them and fired a gun at them. Campbell ran but was shot in the stomach. Johnson and Campbell could not identify the shooter because, from their views, his hat blocked his face.

¶ 9    April Graves testified that in July 2012, she was dating defendant and shared the champagne-colored Buick with him; he generally kept the car at night and would bring it to her in the morning so she could go to school. Late that evening, Graves had the car and was at a friend's house when defendant called her to pick him up. Graves did so, with her young son in the car. When she arrived, defendant got in the driver's seat and they drove to Lake Street and Austin Boulevard, whereupon defendant told her to get out of the car. They fought and defendant tried to pull her out of the passenger seat. She yelled to three men across the street to call police. The men came over and tried to calm defendant down. Defendant yelled at Graves for involving them and eventually got back in the car and drove away to her apartment. The following testimony then took place:

"[State] Q. Prior to going into [your] apartment, did you say something to [defendant] as he dropped you off?

A. Yes.

[Defense Counsel]: Objection; calls for hearsay.

THE COURT: Overruled.

[State] Q. What did you say?

A. 'Don't do nothing crazy.' "

Graves further testified that the next morning, police came to her apartment. She identified defendant and confirmed she was the woman involved in the domestic incident hours earlier. Graves then accompanied police to the station. She had an agreement with defendant that he was to return the car to her at 9:30 a.m. that morning, and around that time, she received a call from him saying that he was outside her apartment in the parking lot.

¶ 10    Additional evidence presented at trial indicated that police arrested defendant on the morning of July 21, 2012 in the Buick in the parking lot of Graves' apartment building. No weapon was recovered. Evidence technicians and forensic investigators recovered and tested eight cartridge casings from the scene of the shooting and one bullet recovered from Johnson after surgery. The cartridges and bullet were all of the same caliber and the cartridges had all been fired from the same weapon. Assistant medical examiner Lauren Moser Woertz testified with respect to decedent Partee's autopsy. In addition to describing Partee's injuries, manner and cause of death, Woertz preliminarily testified as to protocol used at the medical examiner's office. This included brief testimony that each autopsy receives a unique designation when it is assigned and that Partee's was "415 July 2012." Woertz noted that this designation accompanied all photographs, reports and paperwork associated with decedent Partee. Autopsy photographs and reports were admitted into evidence, bearing Partee's designation of 415 July 2012.

¶ 11    Following the denial of his motion for directed verdict, defendant called Detective Chris Matias who testified that immediately before surgery, he interviewed a medicated Johnson who failed to mention in his description of defendant that defendant had facial hair, as well

as Detective Arthur Taraszkiewicz who testified that during an interview, Hardiman told him the shooter had short hair with "[p]ossibly waves." Defendant also called Dr. Geoffrey Loftus, who testified with respect to witness identifications and factors that may affect these, such as lighting and stress. Dr. Loftus admitted, however, that he never interviewed any of the witnesses in this cause and never visited the scene. With this, defendant rested.

¶ 12    The cause then proceeded to closing argument. The State began its argument by stating:

> "Don't do nothing crazy. As you recall, that's what April [Graves] said to [defendant] when he drove off that night. Don't do nothing crazy. Needless to say, he didn't heed her advice.
>
> Crazy or is it murder? Ladies and gentlemen, it was murder. That night that the defendant left April Graves, she knew what he was capable of, he then went on a mission and that mission was to settle a score."

Following further argument, the State concluded by noting:

> "[Partee] got home from work and went outside on a beautiful summer night just to talk to his friends before he went to work out. Because of the defendant's act, because of this act that he believed, this score to settle, this young man became 415 July 2012."

Defendant objected and his objection was overruled. The State reminded the jury that it was:

> "asking you to return the only true verdict in this case. It is the verdict – we are not asking you to return this verdict because you feel bad about what happened or because I'm asking you to.
>
> We are asking you to return the verdicts of guilty because the defendant committed this heinous offense."

¶ 13    After defendant's closing argument, the State presented its rebuttal argument, which included the following:

"Think about this: Who else had a motive to shoot at [Hardiman] and [Powell]? There is nobody else in this world that had a motive to shoot at them that night except the defendant because he was pissed. They got in his business. They interfered in what he was doing, and he was coming back to take care of it.

It's a sad commentary that he shot at people who had nothing to do with that earlier incident. But the fact that he couldn't just accept that he was in the wrong and stay home, think about April's words, don't do nothing crazy. What did he do? He went out and did just that. She knows who he is, and now after hearing all the evidence, you know who he is too."

At the close of trial, the jury found defendant guilty of the first degree murder of decedent Partee and two counts of aggravated battery with a firearm of victims Johnson and Campbell. The trial court sentenced him to 60 years for the first degree murder conviction, and 20 years for each aggravated battery with a firearm conviction, all to run consecutively pursuant to statute, for a total of 100 years in prison.

¶ 14    Defendant filed a motion for a new trial. Among the points of error raised, defendant cited Graves' testimony that she told defendant, "Don't do nothing crazy," in response to the State's question of whether she said something to him after he dropped her off at her apartment. In his written motion, defendant asserted error upon the trial court for allowing this testimony to stand despite his objection at trial, as "the question called for a hearsay response." During argument on his posttrial motion before the court, defendant presented this point, reminding the court that he had objected orally at trial when the question was

asked based on hearsay grounds, and was now arguing in addition to that ground that Graves' response was wholly irrelevant. Accordingly, defendant urged the trial court to reconsider its prior ruling to find that Graves' statement both "was not relevant and in fact constituted hearsay." In response, the State first argued that Graves' statement was an exception to the hearsay rule, and then stated:

"In the event, that in and of itself would not -- did not in any way based on all the facts that the jury heard, that was not the one fact that convicted the defendant."

In ruling on this, the trial court noted that Graves' statement at issue was "an observation" she "made in the presence of the defendant" and, as such, it had not been "offered to prove the truth of the matter therein, which is what hearsay is, that he did something crazy." The court further concluded that Graves' statement amounted to "words of parting" made by defendant's "girlfriend to him, in the vehicle that they were sharing after the earlier incident and prior to" the crimes and, as such, it did not find the statement "in any way to be prejudicial to the defense in this case or the defendant." Accordingly, the trial court denied defendant's posttrial motion, finding that "the fact that a couple of minor words might have been used one way or the other that in retrospect[] might have been better left out, does not change this Court's opinion in any way that the defendant received a fair trial."

¶ 15                                    ANALYSIS

¶ 16        On appeal, defendant contends that he was denied a fair trial, for two reasons. First, he claims that the trial court erred in allowing Graves' testimony that she told defendant, "Don't do nothing crazy," when he dropped her off at her apartment before the shooting. He asserts that this testimony was completely irrelevant and amounted to prejudicial evidence elicited by the State, which it exacerbated by referencing it later during closing argument, to show

that he was "prone to 'crazy' behavior." Second, defendant claims that the trial court erred in allowing the State to comment during closing argument that decedent Partee became "415 July 2012." Defendant insists that this comment implied that Partee was the 415th murder victim in Cook County and was intentionally made with no evidentiary basis other than to inflame the passions of the jury by indicating the "violent nature of crime in Chicago." Defendant also asserts that the cumulative effect of these errors further resulted in prejudice and an unfair trial. We disagree with defendant's contentions.

¶ 17    As a threshold matter, the parties devote significant portions of their briefs on appeal to the issue of forfeiture. In his opening brief, defendant makes it a point to note that he has wholly preserved these issues for our review because he made timely objections at trial and included his claims in his written posttrial motion. The State, meanwhile, responds that defendant only properly preserved one of his claims. That is, the State agrees with him that he did preserve his contention regarding the State's reference to decedent Partee's autopsy designation during closing argument. It argues, however, that defendant did not properly preserve his contentions regarding the admission of Graves' statement nor the State's repetition of her statement during its closing argument. With respect to the former, the State avers that defendant issued an objection at trial to the admission of Graves' statement as she was testifying, but did so specifically, and only, on hearsay grounds, thereby abandoning any claim regarding relevancy which now forms his argument on appeal. With respect to the latter, the State avers that, although defendant now claims error on the part of the trial court and the State for allowing the State to repeat and reference Graves' statement in its closing argument, he never lodged an objection at trial and did not cite this in his written posttrial motion. In his reply brief on appeal, defendant takes on the State's forfeiture argument as

10

"highly formalistic." He points out that, even though he initially asserted hearsay grounds for his objection to the admission of Graves' statement during her testimony and in his written posttrial motion, he additionally asserted relevancy grounds during the hearing on his motion and the trial court addressed both during its ruling on his motion, thereby rendering the argument ripe for review.

¶ 18    In an effort to clarify all this, we note that the crux of the parties' contentions here involve two particular comments, but three particular instances of alleged error: the State's reference to the autopsy designation during closing argument on the one hand and, on the other, Graves' statement made while she testified and the State's later use and repetition of her statement during closing argument. As the parties indicate, and the record makes clear, there is no question that defendant properly preserved the first of these. Pursuant to well-settled law, he objected when the State referenced Partee's autopsy designation during closing argument at trial and he raised this in his written posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (timely objection and written posttrial motion are required to preserve issue for appellate review). Accordingly, this issue was properly preserved for our review.

¶ 19    What else is clear is that, contrary to any insistence by defendant, he did not properly preserve the last of these, namely, the State's reference to and repetition of Graves' statement during its closing argument. As the record demonstrates, he did not raise any contemporaneous objections during any of the instances when the State referenced Graves' statement during its closing or rebuttal closing argument, nor did he raise any of these instances in his written posttrial motion. See, *e.g.*, *Enoch*, 122 Ill. 2d at 186; accord *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 39 (failure to object and/or raise issue in written

posttrial motion results in its forfeiture). Thus, this issue was, essentially, not properly preserved for our review.

¶ 20    What is not as clear, however, is whether defendant properly preserved his claim regarding the initial admission of Graves' statement at trial, made while she testified and in response to the State's questioning. Again, defendant asks for our full review, while the State propounds complete forfeiture and strongly urges us not to review this issue at all. In our view, neither party is wholly correct in their assertions.

¶ 21    The record reveals that, as Graves was testifying, the State asked her whether she said anything to defendant at the time he dropped her off at her apartment immediately following the domestic incident on Lake Street and his confrontation with Powell, Hardiman and McCullins. Defendant contemporaneously objected and later raised the admission of her statement by the trial court as alleged error in his written posttrial motion. It would seem, then, as if he properly preserved this issue for our review. See *Enoch*, 122 Ill. 2d at 186.

¶ 22    However, as the State points out, defendant's contemporaneous objection, as well as his posttrial motion, asserted error on this point specifically, and only, on hearsay grounds, whereas, conversely, his entire argument on appeal is that Graves' statement should not have been admitted because it was not relevant. The State's point is well taken and, technically, correct. When a party makes an objection on specific grounds at the trial level, he forfeits his ability on appeal to assert error on other grounds not specified. See *People v. Steidl*, 142 Ill. 2d 204, 230 (1991); accord *People v. Hayes*, 319 Ill. App. 3d 810, 818-19 (2001); see, *e.g.*, *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 45 (noting that this is the technical rule of law regarding forfeiture). Moreover, as defendant--perhaps believing he properly preserved the issue--has nowhere in his opening or reply briefs on appeal argued plain error, his current

relevancy argument regarding the admission of Graves' statement is, perfunctorily, forfeited. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) (forfeited errors may nonetheless be reviewed on appeal, as long as the defendant raises a plain error argument); accord *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 69 (the defendant has the burden of demonstrating plain error in order to invoke review of unpreserved issues and failing to request plain error review wholly forfeits his argument on appeal).

¶ 23     However, in his reply brief, after finally admitting he did not properly preserve this issue for review (but still not arguing plain error), defendant points us to that portion of the record wherein the trial court issued its ruling on his posttrial motion. Yes, when defendant objected to the admission of Graves' statement during her testimony at trial and when he raised this alleged error in his written posttrial motion, he did so only on hearsay grounds. However, when he appeared before the trial court for hearing on his posttrial motion, he specifically informed the court at the outset that he was raising error based on both hearsay and relevancy grounds. Indeed, defendant urged the trial court to reconsider its decision to allow Graves' statement because it was both "not relevant and in fact constituted hearsay." Interestingly, when he did so, and when the trial court turned to the State for its counterargument, it could be concluded, from the exchange that took place, that the State, too, argued both grounds. The record indicates that when asked for its position, the State responded by not only insisting that Graves' statement was an exception to the hearsay rule, but also that:

> "[i]n the event, that in and of itself would not -- did not in any way based on all the facts that the jury heard, that was not the one fact that convicted the defendant."

This reply could be interpreted as the State arguing, in the alternative, that Graves' statement was not only not hearsay, but was, regardless of this, relevant and its admission was not prejudicial.

¶ 24   In any event, there is the trial court's colloquy to consider here, as well. After allowing defendant to argue hearsay and relevancy grounds, and after allowing the State to respond, the court seemingly addressed the allegation of error surrounding the admission of Graves' testimony on both grounds. First, in examining hearsay, the court called Graves' statement "an observation" that she had "made in the presence of the defendant." According to the court, her statement had not been "offered to prove the truth of the matter therein *** that [defendant] did something crazy" and, thus, it concluded that the statement did not constitute hearsay. Yet, instead of letting this stand as its final ruling, the court continued its colloquy and further discussed the statement's relevancy. The court described Graves' statement as "words of parting" between her, as defendant's "girlfriend," and defendant, and noted that they took place in the very "vehicle they were sharing after the earlier [domestic] incident and prior to" the shootings. From this, the court concluded that, based on the facts presented at trial, it did not find the statement "in any way to be prejudicial to the defense *** or the defendant." With all this in mind—defendant's argument as to relevancy, the State's response to his argument, and the trial court's additional consideration on this ground—there may, indeed, be some merit to defendant's point that he did not forfeit this issue on appeal, even though he did not argue plain error.

¶ 25   Ultimately, our conclusion on forfeiture is this. Obviously, we cannot ignore it as, again, we note the parties spent significant portions of their briefs advocating for and against it. However, we feel, contrary to the State's insistence to otherwise summarily dispose of this

14

appeal, that the technicalities surrounding forfeiture here should succumb to the interests of justice. This applies to all three instances at issue: the State's mention of Partee's autopsy designation which defendant clearly preserved, as well as both the admission of Graves' statement during her testimony which was not so clearly preserved, and the State's repeated references to her statement during closing argument which defendant did not preserve. As a gray area has arisen with respect to the preservation of Graves' statement during her testimony via defendant's assertion of the additional relevancy ground during his posttrial hearing, we feel it would be appropriate to also address his related contention regarding the State's reference to the same statement during closing argument. Thus, while we acknowledge and appreciate the parties' devotion in their briefs to these threshold matters, we note, as we have infinite times in our state's jurisprudence, waiver limits the parties' ability to raise arguments but not our right to entertain them. See *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). Accordingly, just as defendant and the State have both chosen to address the merits of this appeal, and because of the weightiness of the issues at hand and the facts presented, we, too, choose to do so now.

¶ 26    We turn first to the admission of Graves' statement by the trial court. At the conclusion of her testimony, Graves was discussing what occurred immediately after the domestic incident between her and defendant on Lake Street. She testified that defendant drove her and her son back to her apartment in the Buick to drop them off. In response to the State's question of whether she said "something to [defendant] as he dropped [her] off," Graves' answered, "[y]es." The trial court overruled defendant's objection and allowed Graves to complete her answer, whereupon she testified that she told defendant, " 'Don't do nothing crazy.' " Defendant now insists that the trial court erred in allowing Graves' statement

because it was irrelevant and prejudicial. He claims that the statement elicited for the jury that he was a crazy person capable of murder or, at the very least, that he is prone to crazy actions, such as committing violent acts or engaging in shootings.

¶ 27    Evidence is relevant if it has any tendency to make the existence of any consequential fact either more or less probable than it would be without the evidence. See *People v. Pike*, 2016 IL App (1st) 122626, ¶ 33. Indeed, a trial court may excuse evidence, even if it is otherwise relevant, if its prejudicial effect substantially outweighs its probative value. See *People v. Eyler*, 133 Ill. 2d 173, 218 (1989); *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 45. However, the admissibility of evidence at trial, along with the determination regarding probative value and prejudice, are matters within the sound discretion of the trial court (*People v. Brown*, 2017 IL App (1st) 142197, ¶ 71, citing *People v. Morgan*, 197 Ill. 2d 404, 456 (2001)), and we will not overturn those decisions absent a clear abuse of that discretion, which occurs only when the court's decision is arbitrary, fanciful or where no reasonable man would take the view adopted by that court. See *People v. Taylor*, 2011 IL 110067, ¶ 27; accord *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); *People v. Shum*, 117 Ill. 2d 317, 353 (1987).

¶ 28    Based on the record before us, we find no error in the trial court's admission of Graves' cited statement, as it was both nonprejudicial and relevant. With respect to prejudice, there is no basis in the record to indicate any connection between Graves' statement asking defendant not to do anything "crazy" and defendant's insistence that this phrase inherently meant, and clearly conveyed to the jury, that he was prone to crazy actions, such as committing violent shootings, thereby prejudicing him. Rather, in our view, the phrase Graves used—"Don't do nothing crazy"—was, in the context presented, a colloquially innocuous statement. At the

16

time it was made, it did not prove or declare anything with respect to defendant's subsequent actions. Her words were, as the trial court noted, simply words of parting from a girlfriend to the boyfriend whom she cared about; they had just been in a very public domestic fight and she was warning him not to do anything rash or anything that would get himself into trouble, especially as he was still driving the Buick--a car of which she held partial ownership. Graves' words were not probative of anything more nor, for that matter, of anything in particular. They did not reference guns or shooting; they did not reference any mental deficiencies on defendant's part; and, most significantly, they did not reference anything violent *per se*.

¶ 29    In addition to being nonprejudicial, Graves' statement was otherwise relevant to the instant cause, a relevance that lies in the timing of its making. Only minutes after leaving the scene of their domestic incident in front of Powell, Hardiman and McCullins on Lake Street in the Buick they shared, defendant drove to Graves' apartment and dropped her and her son off. According to Graves' testimony, the couple fought that night over the car. Again, they shared the Buick with the general agreement that he would keep the car in the evenings and bring it back in the mornings so she could go to school, but that night, she had the car because she was visiting a friend. Defendant had called her to pick him up late that night, which she did with her young son, and, when they reached Lake Street, he told her to get out of the car so he could have it to himself. With the late hour of evening and with her son in the backseat, Graves refused to get out. Immediately following the resulting domestic incident, defendant dropped Graves at her apartment and Graves made her statement as they parted. Less than 90 minutes later, the shooting took place on Lake Street, killing Partee.

¶ 30        Again, the State's theory on the case was that defendant committed the shooting with a motive of revenge for Powell, Hardiman and McCullins' intrusion into his "business," *i.e.*, their intervention in his argument with Graves. Meanwhile, defendant countered with a theory of misidentification. The timing and context of Graves' statement was relevant to the State's theory with respect to the timing and the events leading up to the shooting and murder but was, at the same time, vague and colloquial enough to be open for the jury's interpretation based on all the evidence presented. Accordingly, its admission was proper as it was both relevant and not prejudicial.

¶ 31        Even were this not true, and even if its admission could be considered error on the part of the trial court (which it was not), any such error would undoubtedly be harmless, based on the record before us. This is because the evidence of defendant's guilt here is overwhelming. See *Meyers*, 2018 IL App (1st) 140891, ¶ 47 ("evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted [the] defendant absent the error"); accord *People v. Montano*, 2017 IL App (2d) 140326, ¶ 124 (reviewing court may find error in admission of evidence to be harmless where error did not contribute to conviction, where properly admitted evidence overwhelmingly supported conviction, or where erroneously admitted evidence was merely cumulative or duplicative of properly admitted evidence).

¶ 32        Powell, Hardiman and McCullins testified, corroboratively, that they witnessed defendant and Graves have a domestic argument in the Buick parked on Lake Street. All three of them provided similar details about the incident, which involved a close confrontation between them and defendant only 90 minutes before the shooting, and all three individually testified that they clearly heard defendant say he would be back. Apart from her statement at issue here, Graves' testimony corroborated these facts. Powell, Hardiman and McCullins also

picked defendant out of a lineup as the man involved in the domestic incident. Additionally, Powell and Hardiman further testified, again corroboratively, with respect to the shooting. They both stated that, once the man in the black baseball hat walking in the alley came within just four or five feet of them, they recognized him immediately as defendant, the man from the domestic incident only 90 minutes before, and that defendant pulled out a gun from his waist, shot first at Hardiman, and continued shooting at the group, which then included Johnson, Campbell, and Partee. Although shooting victims Johnson and Campbell were unable to identify defendant as the shooter because of their position and view of his hat-covered face, Powell and Hardiman distinctly identified defendant as the shooter to police immediately after the murder, picked him out of a lineup as the shooter, noted he was the same man involved in the domestic incident, and identified him again at trial as the shooter.

¶ 33    From all this, there is no reasonable probability that the jury would have acquitted defendant if Graves' statement had not been admitted into evidence and not presented to the jury. Clearly, the jury found the testimony of Powell, Hardiman, McCullins, Johnson and Campbell, along with the State's other evidence, to be credible. Conversely, it found defendant's case-in-chief, which centered principally on the testimony of a witness identification expert who had never interviewed any of the witnesses in this case nor had ever visited the scene to examine the identification factors he discussed, to not be credible. This was the jury's prerogative, and any error in the trial court's admission of Graves' cited statement was harmless in light of the evidence presented, which overwhelmingly proved defendant's guilt. See *Meyers*, 2018 IL App (1st) 140891, ¶ 47; accord *Montano*, 2017 IL App (2d) 140326, ¶ 124.

¶ 34    We now turn to defendant's two remaining assertions of error, which involve the State's closing and rebuttal closing arguments.  In the first of these, defendant again focuses on Graves' statement and points out that the State repeated it to begin its closing argument and referred to it again during its rebuttal closing argument.  He insists that these repeated references show the State used Graves' statement to "define its case to the jury" and that this increased the statement's prejudicial effect to imply that he was the type of person to commit violent crimes.  Second, he further calls for reversal based on the State's reference to decedent Partee as "415 July 2012" during its closing argument, insisting that this implied that Partee was the 415th murder victim in Cook County that year, a fact not in evidence and one made with no basis other than to inflame the passions of the jury to consider "the horrors of violence in Chicago when deliberating."

¶ 35    The State is allowed a great deal of latitude in closing argument.  See *People v. Nieves*, 193 Ill. 2d 513, 532 (2000); accord *People v. Wiley*, 165 Ill. 2d 259, 294 (1995).  It " 'may comment on the evidence and any fair, reasonable inferences it yields.' " *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009), quoting *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).  The test for determining whether there was reversible error because a remark resulted in substantial prejudice to a defendant is whether the remark was a material factor in his conviction, or whether the jury would have reached a different verdict had the State not made the remark.  See *People v. Flax*, 255 Ill. App. 3d 103, 109 (1993); accord *Nieves*, 193 Ill. 2d at 533.  We review the allegedly improper remark in light of all the evidence presented against the defendant (see *Flax*, 255 Ill. App. 3d at 109), as well as within the full context of the entire closing argument itself (see *People v. Cisewski*, 118 Ill. 2d 163, 176 (1987)).  Ultimately, unless deliberate misconduct by the State during closing argument can be

20

demonstrated, comments will be considered incidental and uncalculated and will not form the basis for reversal.  See *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993).

¶ 36     Based on the record before us, and when viewed within their context and within the entirety of this trial, we do not find that the State's comments, as cited by defendant, were erroneous or that they merit reversal and remand of his convictions.

¶ 37     Briefly, with respect to the State's use of Graves' statement, "[d]on't do nothing crazy," to commence its closing argument and its repetition of the statement during rebuttal closing, we have already discussed at length that there was no error on the part of the trial court in allowing the admission of this testimony and, even if there were, any conceivable error would have been harmless.  The State repeated this colloquialism during its summation as part of the evidence that had been presented at trial—evidence from the last witness who saw defendant immediately prior to the crimes.  There was nothing otherwise indicative of the statement, and any insistence on the part of defendant that it inherently implied to the jury he was "crazy" or prone to violent crimes is a tremendous leap in logic wholly unsupported by anything in the record.  Therefore, and because the State ultimately has the right to comment on properly admitted trial testimony in its closing and rebuttal argument (see *Phillips*, 392 Ill. App. 3d at 275, citing *Nicholas*, 218 Ill. 2d at 121), there was no error in its mere mention of the statement during closing argument.

¶ 38     We similarly find no error in the State's use of the phrase "415 July 2012."  At the end of its closing argument, and while describing decedent Partee for the jury (who he was, where he lived, how old he was, his job, his interests and hobbies, etc.), the State made the following comment:

> "Because of the defendant's act, *** this young man became 415 July 2012."

Defendant insists that this comment characterized Partee as another number in a long string of murders in Chicago and influenced the jury to find him guilty as "retribution for society's ills."

¶ 39    Not only does defendant mischaracterize the State's comment, but the record also directly refutes defendant's argument. Contrary to defendant's insistence, the State never referred to Partee as the 415th murder victim in Cook County that year, nor did it ever refer to him as any sort of number in any sense at all. During trial, the State admitted several exhibits into evidence from the medical examiner's office, including photographs and reports regarding Partee, his injuries and his manner of death. In order to explain the content of these for the jury and the designations they bore, the State elicited testimony from assistant medical examiner Woertz that, pursuant to protocol, every autopsy receives a unique reference or identification when it is assigned and Partee's was "415 July 2012;" this designation accompanied all photographs, reports and paperwork associated with him. Thus, "415 July 2012" was a term properly admitted into evidence via Woertz's testimony to explain the exhibits presented and their content, which were also properly admitted into evidence. The phrase was never referred to as a "number," let alone linked to the number of murder victims in Chicago at the time of Partee's death.[2] Therefore, the State's reference to this properly admitted evidence in its closing argument was not erroneous. See *Phillips*, 392 Ill. App. 3d at 275, citing *Nicholas*, 218 Ill. 2d at 121.

¶ 40    Nor did the State, anywhere in its closing or rebuttal argument, or at any time during trial, make any reference or comment with respect to the amount of violence in Chicago or Cook County. Rather, the State used the cited phrase only once and only in relation to the specific

---

[2] We note for the record that defendant never objected to Woertz's testimony in this respect, nor to the inclusion of "415 July 2012" on any exhibits admitted into evidence.

crimes with which defendant was charged, namely, that "[b]ecause of" defendant's actions, Partee "became 415 July 2012," reduced from a man to the designation given him by the medical examiner. In fact, immediately after defendant objected to the State's comment, the State clarified for the jury that it was:

> "asking you to return the only true verdict in this case. *** we are not asking you to return this verdict because you feel bad about what happened or because I'm asking you to.
>
> We are asking you to return the verdicts of guilty because the defendant committed this heinous offense."

Contrary to defendant's assertion, the State did not attempt to influence the jury into using a guilty verdict to "cure" violence in Chicago. Instead, the record clearly demonstrates that the State properly limited its argument to the evidence and facts presented in this particular case.

¶ 41    Additionally, we note that our Court recently rejected this identical argument in *People v. Green*, 2017 IL App (1st) 152513. Just as the instant case, the defendant in *Green* was charged with the first degree murder of the victim, who had been shot in Chicago. After presenting stipulated evidence at trial from the assistant medical examiner that the decedent was designated as "261 May 2011" upon autopsy, that State, during its closing argument, referred to the decedent as such several times, commenting that "he was given a new name, 261 May 2011" on the day he died, that his "name was changed *** to a number *** No 261 May 11," and that he became "[a]nother dead body in the City of Chicago." *Green*, 2017 IL App (1st) 152513, ¶ 53. In addressing the defendant's claim of error and prejudice in the State's closing and rebuttal based on these comments, we found none. See *Green*, 2017 IL App (1st) 152513, ¶¶ 83-84. Instead, we explicitly held that the State's comments were not

23

improper because they were based on the evidence presented at trial which showed that the victim was shot to death and that his body was assigned this particular identification once it arrived at the medical examiner's office. See *Green*, 2017 IL App (1st) 152513, ¶ 83. Moreover, we refuted the defendant's claim of inflamed passion, noting that the State never mentioned other homicides in Chicago nor discussed the broader concern of violence in the city, and that there was no evidence or intimation in the record that that "261" referred to the 261st homicide in the city. See *Green*, 2017 IL App (1st) 152513, ¶ 84. And, particularly with respect to the State's comment that the victim was "[a]nother dead body in the City of Chicago," we similarly concluded that there was no error or prejudice, as the comment made no reference to homicides or violence and was otherwise consistent with the evidence that the victim became another dead body in the city now identified by a case number in the medical examiner's office. See *Green*, 2017 IL App (1st) 152513, ¶ 84 (three comments, "none of which mention other homicides, citywide violence, or any explicit statement that the victim was the result of a larger social problem," did not amount to prejudice and, thus, did not constitute error).

¶ 42    Without more, defendant claims that *Green* was wrongly decided. Without more, however, his claim has no merit. *Green* is directly on point, and we agree with its analysis and holding. Interestingly, the comments made by the State in *Green* could be considered more egregious than those in the instant cause, since there, the State specifically referred to the medical examiner's designation of the decedent as a "number" and stated that he was "[a]nother dead body in Chicago." In the instant cause, the State did not make these added comments, which we found otherwise proper in *Green*. Ultimately, there is simply no connection or basis in the record that provides any merit to defendant's leap in logic that the

State's reference to Partee's autopsy designation of 415 July 2012, which consisted of one mention at the conclusion of closing argument, was based directly on the evidence presented, and was unaccompanied by any broader commentary of any kind, somehow caused irreparable prejudice or an unfair trial.

¶ 43      In his final attempt to advocate for the reversals of his convictions, defendant claims that while each instance of error he has asserted may not, in and of itself, warrant such a remedy, the cumulative effect of them—the trial court's admission of Graves' statement, the State's repetition of this statement during closing argument, and the State's reference to decedent Partee as "415 July 2012"—demonstrates sufficient prejudice so as to have denied him his right to a fair trial. We do not agree. We have thoroughly examined the record, considered each of these cited instances at length, and have found none of them amount to reversible error. Accordingly, as each instance is not error, their cumulative effect similarly cannot rise to the level of reversible error either. See *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 57.

¶ 44      CONCLUSION

¶ 45      For all the foregoing reasons, we affirm the judgment of the trial court.

¶ 46      Affirmed.